**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BEN POTTER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MONDAY.COM LTD., ROY MANN, ERAN ZINMAN, ELIRAN GLAZER, CASEY GEORGE, and HARRIS BEBER,<br><br>Defendants. | Case No. 1:26-cv-01956<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMAND** |

**PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF FEDERAL SECURITIES LAWS**

Lead Plaintiff Steve Quinn ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, alleges the following as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings made by monday.com Ltd. ("monday.com" or the "Company"), the Company's Co-Chief Executive Officer ("Co-CEO") Roy Mann, the Company's Co-CEO Eran Zinman, the Company's Chief Financial Officer ("CFO") Eliran Glazer, the Company's Chief Revenue Officer ("CRO") Casey George, and the Company's Chief Marketing Officer ("CMO") Harris Beber, analyst and media reports, conference call transcripts, Company press releases, interviews with former Company employees, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## I. SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities that purchased shares of monday.com's ordinary shares between August 11, 2025, to February 6, 2026, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. §78a, *et seq*. (the "Exchange Act"). This action brings claims against Defendants monday.com, Co-CEO Mann, Co-CEO Zinman, CFO Glazer, CRO George, and CMO Beber, and seeks to recover damages caused by Defendants' violations of the Exchange Act.

2. The crux of this case is that monday.com misled the market about the collapse of its primary method for acquiring customers and then sold investors on a $1.8 billion revenue target built on that broken acquisition engine. Throughout the Class Period, Defendants knew from their own internal data that the marketing channels responsible for the majority of monday.com's new customers were structurally deteriorating. Rather than tell investors the truth, Defendants dismissed the problem as "temporary" and "trivial," later claimed it had stabilized when it had not, and announced—and repeatedly reaffirmed—a revenue target for which they had no reasonable basis. When the truth emerged, monday.com's stock price collapsed, erasing billions of dollars in shareholder value.

3. monday.com, co-founded by Defendants Mann and Zinman, sells subscription software that businesses use to organize their day-to-day work. Its products consist of online task managers, dashboards, and trackers, which teams use to assign tasks, track projects, manage customer relationships, and coordinate workflows. The software is designed so that workers who are not well versed in technology or programming can customize the different functions the software provides to fit their needs.

4. The Company's software was designed specifically to work best for smaller companies ("small and medium-sized business," or "SMBs") with more nuanced and varied

business needs, requiring more customizable work management software to meet those needs. The SMB market was also more likely to independently search and sign up for monday.com's products and services through the Company's so called "no-touch" channel. The Company had a much more difficult time luring away larger enterprise companies that were already entrenched in their work management software ecosystems, and as such, monday.com faced intense competition in the enterprise space from companies such as Asana, Jira, and Smartsheet. In accordance with the Company's "land-and-expand" business model, new customers would initially sign up for monday.com's services on free trials or inexpensive entry-level subscriptions, and the Company would then try to sell them on additional products and more expensive plans.

5. Rather than relying primarily on salespeople to market its products, monday.com relied on the internet to bring in most of its new customers. In particular, the Company invested heavily in "paid search," where monday.com would pay Google—and other search engines such as Microsoft Bing—to display its website prominently to users in response to related online search results. A typical example of how this strategy worked is as follows: a prospective customer types a phrase such as "project management software" into Google; next, and as a result of monday.com's payment to Google, that customer would see the website "www.monday.com" at or near the top of their search results page; the customer would then click through to the Company's website, view details about its software, and sign up—all without ever interacting with a monday.com representative.

6. The Company called these internet-driven acquisition channels "no-touch" or "self-serve"[1] channels, as the prospective customer went through the process entirely by themselves and no human contact with monday.com was required to acquire a new customer. From a marketing

[1] These terms were used interchangeably by the Company.

perspective, these channels operated at the "top-of-funnel" in the Company's customer acquisition pipeline—that is, they were very often the first line of exposure that prospective customers had to monday.com's products and services.

7. The Company was highly dependent on the "no touch" channels at the top of the funnel to acquire new customers. Its annual report identifies the "prominence of our website in response to internet searches" as "a critical factor in attracting potential customers to our products."[2] As Defendant Beber, the Company's Chief Marketing Officer, put it at the Company's September 2025 Analyst & Investor Day: "[p]aid search is really high intent traffic. It converts within days. People know what they're looking for. They search for work management platform. They click on a link. They pay." Since the no-touch channel was the lifeblood of monday.com's business, investors and analysts scrutinized it closely and repeatedly questioned Defendants about the channel's health at earnings calls and conferences throughout the Class Period.

8. monday.com's no-touch model enjoyed some initial success. However, it carried with it a critical vulnerability: it depended heavily on a steady stream of clicks and sign-ups from internet search results. In 2025, the stream of clicks on which monday.com depended began to dry up. The cause was a fundamental change in internet search. As users began running more of their internet searches through artificial intelligence ("AI") programs such as ChatGPT, Google rolled out a feature called "AI Overviews." Now, when a user searches for anything on Google, instead of simply displaying a list of website links in response, Google generates its own AI-written answer and displays it at the top of the results page. As a result, users increasingly started getting what they need directly from Google's AI answer and never clicked through to the websites (like monday.com) listed below the answer. Other search engines also began implementing similar

[2] monday.com Ltd., Annual Report (Form 20-F) (Mar. 17, 2025) ("FY2024 20-F") at 114.

features, such as Microsoft Bing's integration of Copilot AI answers into its search engine. And some users bypassed traditional search engines altogether, opting instead to engage with AI chat tools like ChatGPT. For a company, whose customer acquisition depended on search-engine click-throughs, these changes in online search struck at the foundation of monday.com's business. The yield on each marketing dollar fell and the cost per qualified lead rose. Fewer clicks meant fewer sign-ups, a higher cost to acquire new customers, and slower growth. And because this shift to AI-generated answers was a fundamental change in how internet search works, the damage to monday.com's no-touch channel was structural and durable, not superficial and short-lived.

9. Defendants were aware of this problem, and they watched its effects ripple out in real time. The Company tracked its marketing performance through an internal analytics system called "BigBrain," which, according to Defendants, measured the click through traffic to its website, sign-up rates, and conversion trends in the no-touch channel.

10. However, rather than disclose the truth regarding the structural deterioration of monday.com's crucial no-touch channel, throughout the Class Period, Defendants made materially false and misleading statements, and/or omitted material facts from the public, regarding the following: (a) Defendants minimized the erosion in their no-touch channel by falsely portraying it as temporary, trivial, and quickly remedied, and later falsely assured investors that the channel had stabilized when it had not; (b) Defendants announced, and repeatedly reaffirmed, a projection of $1.8 billion in revenue by fiscal year ("FY") 2027 that lacked any reasonable basis; and (c) Defendants made misleading statements regarding the adoption and monetization of the Company's new AI products, which they held out as a durable growth engine capable of ameliorating the failing no-touch channel and spurring the Company towards their $1.8 billion

FY2027 revenue target, while concealing that AI adoption was unproven and investment in those AI products was compressing the Company's margins rather than driving profitable growth.

11. *First*, Defendants minimized the nature and severity of the deterioration in monday.com's no-touch channel, misleadingly portraying a serious structural problem as fleeting and immaterial. These included Defendant Glazer insisting that the changes in Google's search functionality and its resultant impact on paid search was "*temporary*" and that the no-touch channel softness would soon be recovered; Defendant Mann minimizing the issue, describing the Google search disruption as "*considerably small*;" Defendant Zinman characterizing the impact as "*very, very low, almost insignificant*;" and Defendant Beber telling investors that the impact of paid-search headwinds was "*quite de minimis*." (Emphasis added).

12. Even as the deterioration persisted, Defendants assured the market that the problem had been ameliorated. On the Company's November 10, 2025 third-quarter earnings call, Defendant Zinman acknowledged that top-of-funnel trends had been "choppy," but assured investors that "*towards the end of the quarter, we saw encouraging stabilization in new sign-up and top of funnel*," that the Company saw "*very healthy demand across all customer segments*," and that "*the pipeline remains healthy*." When analysts pressed on disruption to paid search specifically, Zinman doubled down: "*we saw stabilization… across Google AdWords*[3] *and across all other channels*," and "*the pipeline looks very healthy, it's growing according to our plans*." (Emphasis added). However, these statements belied the truth: the no-touch funnel had not stabilized, top-of-funnel activity continued to weaken, and the cost to acquire no-touch, self-serve customers continued to rise.

[3] Google AdWords, now officially named Google Ads, is Google's "paid search" online advertising platform. As described above, for monday.com, this was the foundation of their no-touch channel.

13. *Second*, Defendants announced an ambitious $1.8 billion revenue target without a reasonable basis, representing to the market that their growth trajectory remained stable despite continued headwinds. At the September 17, 2025 Investor Day—held just five weeks after Defendants publicly dismissed the Google disruption as "temporary" and "almost insignificant"—Defendants announced a "base case" target of $1.8 billion in revenue by FY 2027. Defendants had no reasonable basis for this target, and its announcement misled the market regarding the Company's growth trajectory. It assumed the continued productivity of the no-touch acquisition engine that Defendants knew, from their own internal data, was structurally impaired, and Defendants disclosed nothing else to the contrary. Nor did Defendants present the target as aspirational; by labeling it a "base case," they represented to investors that $1.8 billion was the outcome the Company expected even if conditions did not improve, and grounded the target in present conditions, confirming that this number "*took into account the trends that we see today*." Defendants then repeatedly—and misleadingly—reaffirmed the target even as the no-touch channel on which it depended kept eroding. For example, on the November 10, 2025 Earnings Call, Defendant Mann declared that monday.com was "*firmly on track toward our Investor Day revenue target of $1.8 billion of FY27*." (Emphasis added).

14. *Third*, Defendants overstated the adoption and durable monetization of monday.com's AI products. Confronting a customer acquisition engine they knew was failing, Defendants directed investors to a replacement: a suite of newly launched AI products that Defendants represented as already achieving extraordinary uptake and capable of producing durable revenue growth. These misstatements include: Defendant Zinman proclaiming, "[o]ur customers are thirsty for AI usage and *the adoption is off the charts*;" and Defendant Glazer tying that purported adoption directly to the Company's growth trajectory, stating that "*from the*

*multiproduct that we have, the platform that we continue to invest with monday DB*[4] *the fact that we are leveraging AI and capabilities into -- layered into our platform*, the fact that we are enhancing the enterprise customers' capabilities . . . this all gives us the confidence that *we will continue to grow the business, driving durable revenue growth at scale going into $1.8 billion in fiscal year '27.*" (Emphasis added). Defendants carried this theme into the November 10, 2025 earnings call, touting new AI features as ripe for monetization.

15. These statements were materially false and misleading. Defendants presented usage of free and newly launched AI features as though it had commercial traction when the AI products were not generating revenue at any level capable of offsetting the deterioration in the no-touch channel. Defendants confirmed as much only after the Class Period, when the Company guided fiscal 2026 gross margins downward and attributed the decline in part to AI infrastructure costs, with Defendant Glazer attributing the withdrawal of the $1.8 billion target to "*the evolving nature of the AI landscape and the choppiness in the no-touch demand environment*." (Emphasis added).

16. Defendants knew, or recklessly disregarded, that all of the above statements (and others detailed herein) were false and misleading when made. Defendants closely monitored the Company's acquisition channels, marketing spend, and top-of-funnel metrics in real time through the Company's internal "BigBrain" analytics system, which measured performance marketing data, and Defendant Mann acknowledged that the paid search headwinds were "nothing we didn't see before." As alleged below, former employees confirm that the deterioration of the no-touch channel, the adverse traffic and conversion trends, and slowed growth were tracked and known internally throughout the Class Period.

---

[4] The name of the internal database technology that powers monday.com's platform.

17. The truth began to emerge on November 10, 2025—though even then, the disclosures were only partial. Although the Company beat analyst and investor revenue expectations for the third quarter of 2025, Defendants told investors to expect slower growth in the fourth quarter. That guidance partially revealed that the weakness in the no-touch channel was not the short-lived, readily mitigated problem Defendants had described. In response, monday.com's shares fell 12.3%.

18. The full truth was revealed on February 9, 2026, when monday.com released its fourth-quarter and full-year 2025 results. At the accompanying earnings call, the Company rescinded the $1.8 billion FY2027 target entirely, with Defendant Glazer attributing the reversal to "*the evolving nature of the AI landscape and the choppiness in the no-touch demand environment*." (Emphasis added). The Company also issued fiscal 2026 revenue guidance of $1.452 billion to $1.462 billion—representing 18% to 19% year-over-year growth, a steep deceleration from the 27% growth the Company had achieved in FY2025, and well below consensus expectations. Defendant Glazer conceded that the guidance "*doesn't assume any rebound in performance marketing*[5] *or top-of-the-funnel*[6] *activity*," (emphasis added) and that the Company "*didn't see the improvement that we expected to see*" in the "*no touch business*."

19. In response to the February 9, 2026 disclosures, monday.com's ordinary shares stock price plunged approximately 21% from a February 6, 2026 close of $98.00 to close at $77.63, erasing over $1 billion in market capitalization in a single session.

---

5 Performance marketing is a strategy where brands pay for advertisements only when a specific action is completed by a prospective customer such as a click, lead, or sale. Paid search and monday.com's no-touch channel fall under the umbrella of performance marketing.

6 As described above, monday.com's no-touch channel operated at the Company's top-of-funnel, meaning that it sat at the top of the Company's customer acquisition pipeline—i.e., new customers would be first exposed to monday.com through searching, clicking on the Company's website, and signing up.

## II. JURISDICTION AND VENUE

20. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

21. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

23. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa(a)) and 28 U.S.C. §1391(b), as a significant portion of Defendant monday.com's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

24. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

### A. Plaintiff

25. Lead Plaintiff Steve Quinn purchased monday.com ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements alleged herein.

### B. Defendants

26. Defendant monday.com is an international corporation with its principal executive offices located at 6 Yitzhak Sadeh Street, Tel Aviv-Yafo, L3 677750, Israel. During the Class

Period, the Company's ordinary shares traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "MNDY."

27. Defendant Roy Mann ("Mann") was, at all relevant times, the Co-Chief Executive Officer and Director of monday.com.

28. Defendant Eran Zinman ("Zinman") was, at all relevant times, the Co-Chief Executive Officer and Director of monday.com.

29. Defendant Eliran Glazer ("Glazer") was, at all relevant times, the Chief Financial Officer of monday.com.

30. Defendant Casey George ("George") was, at all relevant times, the Chief Revenue Officer of monday.com.

31. Defendant Harris Beber ("Beber") was, at all relevant times, the Chief Marketing Officer of monday.com.

32. Defendants Mann, Zinman, Glazer, George, and Beber are referred to herein together as the "Individual Defendants."

33. monday.com, together with the Individual Defendants, are referred to herein as the "Defendants."

34. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of monday.com's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, but not to the

public, each Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the statements at issue were materially false, misleading, and/or incomplete when made. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants. Each Individual Defendant is also liable as the maker of the statements they personally made, as identified by speaker and date herein, and monday.com is liable as the maker of the statements contained in its press releases, shareholder letters, and SEC filings. Each Individual Defendant had ultimate authority over the content and communication of the statements attributed to them.

35. monday.com is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

36. The scienter of the Individual Defendants, and other employees and agents of the Company is similarly imputed to monday.com under respondeat superior and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Overview of monday.com and its Business Model

37. monday.com was founded in Tel Aviv, Israel, in 2012 by Defendants Mann and Zinman (together with Eran Kampf) as "dapulse." On June 10, 2021, monday.com commenced its initial public offering ("IPO"), issuing 3,700,000 ordinary shares to the investing public at $155.00 per share, raising gross proceeds of approximately $574 million at an implied valuation of approximately $6.8 billion. The Company's ordinary shares trade on the NASDAQ Global Select Market under the ticker symbol "MNDY." The Company is dual-headquartered in Tel Aviv and New York City.

38. Since monday.com is organized under the laws of the State of Israel, it reports to the SEC as a "foreign private issuer." Unlike a domestic issuer, monday.com files its annual report on Form 20-F and furnishes its quarterly financial results to the SEC under cover of Form 6-K. Throughout the Class Period, monday.com was co-led by its two co-founders, Defendants Mann and Zinman, as Co-Chief Executive Officers.

39. monday.com sells a cloud-based software platform that the Company historically marketed as its "Work OS" (Work Operating System), a work management tool that enables non-technical users to assemble customized task trackers, visual dashboards, and customer-relationship managers, to help manage projects, workflows, and business processes. Built on that platform, the Company sells a suite of distinct products: (i) monday work management, the Company's flagship product and work-management offering; (ii) monday CRM, a customer-relationship-management product for sales teams; (iii) monday Dev, a product for software-development teams; and (iv) monday service, an IT- and service-management product made generally available in early 2025.

40. Beginning in 2025, the Company overlaid its product suite with a set of AI offerings that Defendants placed at the center of the Company's growth narrative, including: "AI Blocks" (pre-packaged AI functions embedded in customer workflows); "monday Sidekick," an AI assistant; AI "agents" marketed as a "Digital Workforce" capable of completing tasks without human intervention; and "monday Vibe," an AI application building tool.

41. During the Class Period, the vast majority of monday.com's revenue consisted of subscription fees. The Company sells access to each product on tiered plans—generally "Basic," "Standard," "Pro," and "Enterprise"—priced per seat, per month, with discounts for annual billing and a minimum seat requirement on paid plans. Customers may subscribe on a monthly or annual basis, and self-serve customers can sign up, enter a credit card, and begin paying with no

interaction with a salesperson. As a result, monday.com's revenue growth depends on a combination of (i) new customer additions, (ii) seat expansion and plan upgrades within existing customers, and (iii) specifically priced AI actions.

42. In May 2025, Defendant Casey George joined the Company as its Chief Revenue Officer. He immediately began insisting on a stronger growth tone and announcing impossible growth targets at numerous internal meetings. According to the Company's press release on April 3, 2025, George was hired to "lead the company's next phase of growth, specifically within the enterprise market, and oversee the CRO organization and revenue strategy." The press release also noted monday.com's stated goal to "grow headcount by 30 percent, with heavier investments to build out the sales teams" in 2025.

43. monday.com reported revenue of $972.0 million in FY2024 (up 33% year-over-year) and $1.23 billion in FY2025 (up 27%), and, by the end of 2024, the Company claimed approximately 245,000 customers worldwide. Yet, as of February 2026, only 63,914 of those customers were "paid customers with more than 10 users," and only 4,281 had annual recurring revenue exceeding $50,000. As a result, small, self-serve customers—acquired primarily through no-touch channels—remained the foundation of the business.

**B. Customer Acquisition and the "No-Touch" Channel**

44. From its founding, monday.com's defining marketing strategy was to acquire customers primarily through performance marketing with heavy investment in online marketing and paid search. In its SEC filings, the Company describes its go-to-market strategy as an effort to "scale [its] self-serve funnel," where customers would learn about and sign up for the Company's services without any human interaction. In paid search, prospective customers would encounter monday.com through internet search results; click through to the Company's website; sign up for a free trial; and convert to paying subscribers often without ever speaking to a Company

employee. Defendants and analysts referred to these performance marketing acquisition engines as their "no-touch" or "self-serve" channels.

45. The no-touch acquisition engine was expensive and heavily dependent on Google and other search engines to facilitate click-through traffic to monday.com's website. In its annual reports, the Company disclosed advertising costs of $181.4 million in 2022, $203.2 million in 2023, and $218.4 million in 2024. As discussed below, Interviewee 1—a former senior executive and head of CRM go-to-market at monday.com through June 2025—noted, "a lot of the marketing budget with monday in general was going to search term words."

46. The Company's annual reports confirm the centrality of the no-touch channel, stating that monday.com's success depends on its "ability to attract customers through paid and unpaid internet search results on web search engines, such as Google," and that the "prominence of our website in response to internet searches" is "a critical factor in attracting potential customers to our products."

47. Defendants had extensive visibility into the no-touch channel's performance. monday.com repeatedly touted a proprietary, in-house analytics system called "BigBrain" that tracks the Company's operations in real time, including, per the Company's own Form 20-F, "media buying statistics tracking." As Defendant Zinman explained: "we have a big brain, and we monitor all the performance stuff . . . we monitor every campaign, every click, every expense."

48. The no-touch channel's dependence on search traffic made it acutely vulnerable to a structural change in how internet users perform searches and receive results. In 2024 and 2025, Google deployed and aggressively expanded "AI Overviews"—AI-generated summaries that answer a user's query directly on the search results page—reducing the frequency with which users clicked through to third-party websites such as monday.com's. Throughout 2025, users also began

bypassing search engines and running more of their searches instead through AI chatbots and other large language model ("LLM")[7] tools such as ChatGPT, which further disrupted monday.com's paid search traffic. As Interviewee 1 (discussed below) pointed out, "now more and more is coming from places like ChatGPT and other LLM tools. Now, people aren't putting in search for information on Asana. They're talking to ChatGPT and getting all kinds of results that it's crawling Reddit groups, and it's crawling forums, and it's like you can't buy that spot in Google for people who are getting their information from ChatGPT first." For a company that had built its business on converting search clicks into free trials and free trials into subscriptions, the sustained erosion of monday.com's website traffic was not an insignificant problem; rather, it was a direct threat to the Company's customer-acquisition engine, its net-new customer growth, its net dollar retention, and, ultimately, the revenue trajectory Defendants had promised the market. As alleged herein, that threat had already materialized by the start of the Class Period, and Defendants knew it.

### C. The Company Announces an Illusory $1.8 Billion Target

49. On September 17, 2025, at the Company's annual Analyst & Investor Day, Defendants announced for the first time a revenue target of $1.8 billion for fiscal year 2027. Defendant Glazer introduced the figure as "the slide that you've all been waiting for," telling investors, "we believe, and we are confident that we are going to achieve $1.8 billion [] in fiscal year '27." Defendant Glazer grounded the number in the Company's existing business performance, citing "the multi-product that we have, the platform that we continue to invest with mondayDB, the fact that we are leveraging AI and capabilities into -- layered into our platform,"

---

[7] A large language model, or LLM, is an artificial intelligence system trained on vast amounts of text that generates responses to questions and prompts, and has the ability to access the internet to respond to users' queries.

and "[t]he fact that we are enhancing the enterprise customers' capabilities, which means bigger and larger customers will continue to buy monday." Defendant Glazer supported the target with other contemporaneous metrics that he stated provided "predictability and visibility into the numbers of monday."

50. Asked whether the market should treat $1.8 billion as a midpoint, floor, or high end, Defendant Glazer answered that "[y]ou should think about that as a base case. This is what we believe we can achieve," and Defendant Mann added that "we look at it as a baseline." Defendants reaffirmed the target on the subsequent November 10, 2025 earnings call, where Defendant Mann stated that third quarter results put the Company "firmly on track toward our Investor Day revenue target of $1.8 billion of FY27," and Defendant Glazer noted that the Company "feel[s] very confident with the number based on everything that we see today." Less than three months later, on February 9, 2026, Defendants withdrew the target entirely in the face of persistent no-touch channel headwinds.

### D. monday.com Goes "All In" on AI products

51. Beginning in 2025, monday.com introduced a series of new artificial intelligence features into its existing platform. On the August 11, 2025 earnings call, Defendant Mann announced monday magic, monday vibe, and monday sidekick, describing them as "three AI-powered capabilities that mark a major step forward in our evolution from work management to work execution." monday magic translates an input description of a business need into a programmed monday.com solution—e.g. building a solution to track and manage employee tasks, or as the Company's Chief Product and Technology Officer described at the September 2025 Investor Day, "translating user intent in plain English to a full monday solution in minutes." monday vibe is a separate "vibe coding" product that lets users build custom applications on top of monday.com's platform without writing code. monday sidekick is what the Company called "a

personal AI agent for every monday user" that "knows the full work context, the user role, its company, all past tasks and projects." At the September 2025 Investor Day, monday.com announced a fourth AI product, monday agents, described as allowing customers to deploy AI agents that perform work autonomously.

52. Defendants presented these products not as experiments, but as the engine of monday.com's future growth. Defendant Zinman told investors at the Investor Day that "we want to go all in on AI," and that monday.com was "amplifying and changing our company North Star" from managing work to "actually doing the work for our customers" using AI. He reported "over 67 million AI actions on our platform," "45,000 actions in monday sidekick alone," "7,000 apps" built in monday vibe "in just two months," and "2,000 solutions" built with monday magic in "less than three months," concluding that "[w]e've never seen traction like this in any feature we've released" and that "[o]ur customers are thirsty for AI usage, and the adoption is off the charts." Defendant Glazer identified continued investment in "platform and AI" as a "growth driver," and Defendant George told investors that "AI is foundational to all of this," explaining that "when I say multi-product, we lead with AI. When I say accelerate upmarket, we lead with AI. When I say customer retention . . . AI is at the forefront of that."

53. Defendants carried that characterization into the Class Period, with Defendant Mann stating on the November 10, 2025 earnings call that "surging engagement with our AI offering positioned monday.com strongly for its next phase of growth," and Defendant Glazer affirming that "AI product engagement is accelerating."

## E. In Reality, monday.com's Growth Was Deteriorating

### 1. Former Employees Confirm the True State of Affairs

54. Accounts provided by former monday.com employees, each of whom held a customer-facing revenue role in the Company's North American business, show that the

Company's customer growth was deteriorating beyond the no-touch channel weakness, as the Company was experiencing a slowdown in expansion, customers were reducing product usage, the products were not up to par nor easily used, and management made up impossible targets that nobody was meeting. As described above, the click-through traffic feeding the Company's no-touch channel was most significant in acquiring its smaller customers, who signed up and paid without ever speaking to a salesperson, and constituted the Company's primary growth and revenue drivers. Erosion of the traffic feeding this base therefore put pressure on the Company to accelerate growth in its upmarket mid and enterprise segments. However, the accounts of former employees, each identified below as an "FE" to preserve anonymity, illustrate the Company's declining growth rates, failures in the multi-product ("land-and-expand") business model, and difficulty breaking through into the mid- and enterprise markets, which compounded the negative impact brought on by the deterioration of the Company's self-serve channels, and demonstrated the unattainability of its lofty revenue targets.

55. Together, the FEs' accounts establish that the Company's customer expansion was slowing materially in both the mid-market and enterprise segments before and throughout the Class Period, quotas linked to expansion efforts were going unmet across entire teams and segments, customers were reducing their usage of the products, the Company's AI offerings were so poorly understood internally that the salespeople charged with selling them could not explain what they were, and there was no basis for the $1.8 billion target given to investors.

56. The FEs further confirm that monday.com tracked customer usage, renewals, and expansion on a daily basis through BigBrain and Salesforce and that deterioration in those metrics was escalated to management (but to no avail). The accounts also illustrate that management committed the Company to enormous revenue targets without ever offering employees an

explanation or a plan for reaching them, and that employees were being told internally that the Company was missing its targets at the same time the Company was issuing public statements that the Company was exceeding those targets.

57. FE-1 worked at the Company from May 2022 to March 2026 as an Enterprise Customer Success Manager, handling a book of 30 enterprise accounts. FE-1's responsibilities included ensuring customers found value in the product, optimizing the product for customers, troubleshooting, and renewals. FE-1 handled forecasting and "gathering customer sentiment" about the product. As part of forecasting, FE-1 would advise sales personnel if a customer was likely to renew or expand three to six months out from their renewal date. FE-1 reported to Matt Ferrara, Team Manager, Enterprise Customer Success, who reported to Ruchita De, who reported to Cassie Vaughn, Regional Vice President, NAM & LATAM Customer Success.

58. FE-1 stated that they noticed a "significant" slowdown in expansion and actually saw a lot of customer[s] reducing their usage, especially during their last year at the Company from March 2025 to March 2026.

59. FE-1 stated that a lot of customers, and particularly enterprise customers, have access to other tools that have similar functionality as monday.com, including Asana, ClickUp, and Jira.

60. Therefore, there was steep if not insurmountable competition for the Company's products that management failed to account for. As one market analyst wrote, "monday.com… has fierce competition in everything that it does. Its CRM products compete against the likes of

Salesforce and HubSpot (HUBS), while its workflow and dev tools are up against Atlassian (TEAM) and ServiceNow."[8]

61. FE-1 stated that the customer success team was "always feeling like the communication being shared was that we weren't hitting targets." At the same time, according to FE-1, the team would see public headlines touting that the Company was exceeding targets – statements employees found "confusing."

62. FE-1 shared that renewals were tracked internally within monday.com and shared with the customer success leadership, and "likely" the sales leadership. FE-1 explained that BigBrain was used to track how customers were using products, including how many active users they had, user information and the activity by users across the account. According to FE-1, BigBrain would send an alert to the customer success manager if there was a significant drop in usage by an account.

63. FE-1 confirmed that executive management frequently shared the target of $10 billion ARR [annual recurring revenue] in the next five years at Company-wide meetings starting in 2024. FE-1 said that this goal did not seem reasonable to employees and that "the idea wasn't sold very well to us internally."

64. FE-2 was formerly employed by the Company as a Mid-Market Account Manager from June 2024 to November 2025. In FE-2 's role, FE-2 worked with existing mid-market customers to expand business. FE-2's direct manager was Mike Lacerenza, Director—Account Management, Mid-Market, who reported up to Jamison Powell, Senior Vice President of Sales &

[8] *Latest Tech Stock Analysis,* SEEKING ALPHA: STOCK IDEAS: TECHNOLOGY https://seekingalpha.com/article/4791418-mondaycom-exceptional-buy-as-new-products-and-upmarket-push-take-off-upgrade.

GM North America. According to FE-2, when Powell left, Lacerenza reported to the Chief Revenue Officer Casey George.

65. FE-2's book of customers included about 80 companies with revenue goals of $80,000 per month, which FE-2 described as "really hard to hit" and "no one hit [their goals]" in FE-2's department of 30 people. In the last six months of 2025, FE-2 believes they hit their monthly target once. Otherwise, FE-2 was "maybe" hitting around $50,000 in revenue. "We didn't have a ton of product to sell," FE-2 explained. And since FE-2's role was all based on growth of existing customers, if those customers weren't growing, they couldn't add seats. On top of a lack of customer growth, FE-2 said that the products monday.com had to offer were "shitty" and "weren't super attractive" for new customers to buy. This made adding more seats the only real way to grow and rendered the $1.8 billion target even more unrealistic.

66. FE-2 described the AI products as "really confusing." FE-2 struggled to explain it, noting that FE-2 didn't even understand what they were. FE-2's colleagues were equally confused, even as the push to sell AI started around the spring of 2025.

67. FE-2 noted that when FE-2 first joined the Company in 2024, customers were growing and adding licenses. According to FE-2, eventually, that stopped and they had to pivot in 2025. FE-2 believed "leadership knew" about the growth issues because they shifted the blame to the account managers, calling them lazy and saying that they were not working hard enough. "They knew that the business wasn't doing well," FE-2 said of Company executives. FE-2 stated that when the new CRO George joined in late 2025, the messaging was that account managers "aren't working hard enough" and that changes needed to be made. According to FE-2, however, there were never any changes made to the products being sold.

68. According to FE-2, FE-2's monthly quota was raised from $60,000 to $80,000. "We'd share all the time it was difficult and things weren't going well," FE-2 said of FE-2's team when they would meet and speak with Lacerenza. According to FE-2, Lacerenza would tell them he heard them and say he would bring it back to leadership, but nothing came of it.

69. FE-2 noted that in FE-2's last two months with the Company, customer expansion was slowing and FE-2's manager was aware. "It kept going down," FE-2 said. By the time FE-2 left in November 2025, it was still "really difficult" to hit FE-2's targets. "Mid-market definitely didn't hit their segment targets," FE-2 said of the end of 2025.

70. FE-3 worked at the Company from April 2021 to June 2025. FE-3 was hired as an account executive and was then an account manager for FE-3's last two years at the Company. As an account manager, FE-3 managed 70 to 80 accounts of existing customers with 100 to 500 employees in the commercial segment. FE-3 first reported to Prasanna Budovsky, and then Mike Lacerenza.

71. According to FE-3, BigBrain tracked "everything," including usage, spend, account tier, and whether there were new users on the account. FE-3 added that BigBrain was connected to Salesforce and that most of the data "lived" in Salesforce. According to FE-3, employees could access renewal information in both places. FE-3 shared that there were regular account status reports available on BigBrain that were updated daily. These reports weren't distributed but any employee could access them and employees at FE-3's level were "living in those dashboards daily." FE-3 shared that BigBrain would send account managers email alerts if an account was past its renewal date or if there was usage on an account that was not covered in the contract. FE-3 also shared that all credit card payments were processed through BigBrain.

72. FE-3 stated that executive management began stating in multiple all-hands meetings starting in August 2024, that they had a goal to reach $10 billion ARR within five years. According to FE-3, executive management never explained why they felt the Company could hit that target, and sales employees were never given any kind of plan for how to reach that goal. FE-3 noted that the Company did not make any major product shift along with this target. FE-3 said that sales employees felt that target "did not seem reachable." FE-3 said that sales employees "constantly" asked middle management how they were going to hit the goal, and the response from management was simply, "you'll figure it out."

73. FE-3 shared that from summer 2024 through all of 2025, monday.com was still hiring sales employees and there were very high monthly and quarterly goals. FE-3 stated that there was "very little attainment" of those goals, and that when salespeople couldn't hit their targets, instead of layoffs, the Company put a lot of sales employees on performance improvement plans (PIPs), which FE-3 described as being a way of "laying off [employees] without actually laying [them] off."

74. Even so, in 2025 monday.com was ramping up its headcount while its existing employees were idle and unable to meet their targets. As one market analyst highlighted, "one area of concern is monday.com's continued buildup in headcount to support its growth. It ended Q1 with 2,695 total employees, up 36% y/y. The Company reiterated its plans to grow headcount by 30% this year (implying hiring ~750 people in 2025), at the precise time that many peers are utilizing the current macroeconomic slowdown and the benefits of AI to slow down hiring or even to execute layoffs."[9]

[9] SEEKING ALPHA, *supra* note 8.

### 2. AlphaSense Interview with Former High-Level Employee at monday.com

75. AlphaSense is a market-intelligence platform that provides access to research and various other types of market-relevant information and publishes interviews with industry professionals familiar with a given company. Professionals familiar with monday.com through their past or present employment or commercial relationships have given interviews about monday.com on that platform.

76. One such interviewee, herein described as "Interviewee 1," held a high-level position as the head of monday.com's CRM go-to-market strategy for North America until June 2025. Interviewee 1 gave an interview on January 16, 2026 that was published on January 30, 2026. Interviewee 1 was part of the senior leadership team at monday.com and previously spent 11 years as a product go-to-market head at Salesforce.

77. Interviewee 1 explained that the Company's search-driven top of funnel had been deteriorating very rapidly, and that the deterioration was caused by a permanent shift in how users started searching online:

> That was deteriorating very rapidly on search words though, because a lot of the marketing budget with monday in general was going to search term words. People go into Google and search for maybe it's work management, maybe they're searching for Asana and Smartsheet, but monday's paying big dollars to Google to move to the top of the search results and usurp that spot from Asana. You're searching for Asana, and the first thing that comes back in your search results is monday.
>
> What's going on is now more and more is coming from places like ChatGPT and other LLM tools. Now, people aren't putting in search for information on Asana. They're talking to ChatGPT and getting all kinds of results that it's crawling Reddit groups, and it's crawling forums, and it's like you can't buy that spot in Google for people who are getting their information from ChatGPT first.

> *The yield on all those dollars going to Google was just plummeting. The cost of a marketing-qualified lead[10] was going up. I don't think that's a unique problem to monday, but their cost to that top of the funnel has really been impacted by the overall behavioral change that people are doing their research more and more in ChatGPT and less in Google Search words.*

(Emphasis added.)

78. When the interviewer observed that monday.com had called the search-traffic disruption issue out but tried to de-emphasize it by stating that only 10% of their net new ARR was generated by Google and asked whether that characterization lined up with Interviewee 1's experience. Interviewee 1 rejected the framing:

> *No matter what you call it, the cost of a marketing qualified lead going over $500, and your average deal size, there's a lot going on there with the cost of sale and customer acquisition. Those are not good underlying, healthy foundations.*
>
> *If I'm investing in a SaaS company, I want to know what the break-even is between their costs of customer acquisition and sales and marketing cost*, and like, "When is this company going to break-even on this customer? Did they have to keep a subscription for three years just to be break-even?" There's a lot of things that monday does efficiently, but *the call-out there is that the customer acquisition cost from that kind of PLG[11] top-of-funnel marketing was going up rapidly during my time there*. That's what I wanted to share with you.

(Emphasis added.)

79. Interviewee 1 further explained that monday.com's concentration in the small-medium-business ("SMB") segment—which was primarily driven by monday.com's no-touch channel—carried a fundamental retention problem that the Company had to outrun:

> Given where a lot of their install base is, one of the big downsides of being an SMB-focused SaaS provider is you deal with very, very high levels of churn in your customer base. For example, when I was head of adoption at Salesforce, we ran a ten figure business on the assumption of 7% churn, 93% retention every year. If

---

[10] Another way of describing customer acquisition cost.

[11] "PLG" stands for product-led growth, a business strategy where the product itself serves as the main driver of customer acquisition, retention, and expansion. Key components often include self-serve models (like monday.com's), user-driven growth (like monday.com's multi-product or "land and expand" model), and easy online onboarding processes (like monday.com's no-touch channel). It stands in contrast to sales-led growth ("SLG"), which relies on human sales teams, pitches to clients, and negotiated contracts.

> we just looked at SMB, that churn rate was 30% just from SMB. Those companies are small. They go out of business, they get acquired.
>
> *The problem for monday is in that SMB sweet spot, they have a lot of churn, they have a lot of non-renewals, and it's also hard to keep filling more and more water into that top of the bucket when you have a bigger hole leaking the water out on the bottom of the bucket because there's a lot of churn to outrun.*

(Emphasis added.)

80. Interviewee 1 also expressed skepticism about monday.com's ability to make headway in the enterprise market:

> *In no way, shape, or form is it a Salesforce for an enterprise company like Amazon with 50 orgs and global businesses, and just the complexity of hierarchies, and business units, and splits among teams. monday doesn't do any of that.*
>
> . . .
>
> It's like I'm looking at a spreadsheet that tells me where the work is, but the core work behind it is not moving through a system like monday. That's what companies like SAP and ServiceNow build big, big backbones on AWS and Azure, and they're managing massive data warehouses and intelligence, *and Monday's not any node on that enterprise architecture. It's a tool.*
>
> . . .
>
> It's like every company I've worked for that has a bundle of Jira licenses, Microsoft Office licenses, Google Gemini licenses. It's just in your company's toolbox in a lot of these enterprise companies that they have a bunch of them. *If you want to request one, you request one, but there's no top-down governance that says we live in monday here. I only see that at team or department levels.*
>
> . . .
>
> *What I found was they haven't really pivoted to that command of the message or top-down work because a lot of the things that were still going on when I was there was, it still behaved very much like a company that sells to the lead rather than the account in enterprise.*

(Emphasis added.)

81. Indeed, when asked whether Interviewee 1 thought monday.com could achieve a shift from SMB to enterprise within the next two years, Interviewee 1 answered, "No."

82. Interviewee 1 also noted that monday.com had hitched a lot of its growth plan to the adoption of AI, and described the monetization mechanism and its limits:

> It's not saying they don't have a growth plan, but I think what I would want you to hear from me is they have hitched a lot of that to adoption of AI in the form of features that they are including like monday Magic, and monday Vibe and Agent Marketplace. Why are they doing that? They're doing the same freemium or starter packs that everybody is doing.
>
> The push there is they want to help you drive your adoption like forward deploying help to you to say, "Oh, look at all this cool AI stuff we can be doing, generating our emails for us, and reading our support tickets for us, and all this stuff is great, but that's burning tokens." They can come back to you and say, "Wow, you're really using a lot of AI capability. Now, you need to buy a bundle of another $50,000 on your license to pay for all the AI tokens."
>
> *That's what everybody doing is they're giving you the freemium access to a bunch of AI capability, and then encourage you to use it because you're burning consumption credits, and then you have to buy more. Yeah, they get a little bit of uplift on you need more APIs, you need more, automations to fire every month. That's not a big money maker for them, and I think they're banking on AI being the silver bullet for upsell because it's not just your sale for your user information.*

*(Emphasis added.)*

**F. Defendants Made Numerous Material Misstatements and Omissions During the Class Period**

83. Throughout the Class Period, in earnings calls and investor conferences, Defendants made materially false and misleading statements and omitted material facts from the public in three primary ways: (a) Defendants minimized the deterioration of monday.com's no-touch, self-serve customer acquisition channel; (b) Defendants announced and repeatedly reaffirmed an illusory and unrealistic revenue target of $1.8 billion for fiscal year 2027; and (c) Defendants overstated the adoption and durable growth potential of monday.com's newly launched AI products.

### 1. Defendants Minimized the Deterioration of the Company's No-Touch Channel

#### a. August 11, 2025 Earnings Call

84. For additional context, leading up to the start of the Class Period, Defendants had not previously disclosed any softness in their customer acquisition channels during the first quarter of FY 2025. To the contrary, on the Company's May 12, 2025 earnings call, when asked directly about how AI-driven changes to search channels would impact the Company's top-of-funnel, Defendant Zinman responded that "the demand is very healthy," and "we're able to continue and invest in growth in a very good way," going as far as to attribute the Company's strong first quarter 2025 customer additions to "stronger performance marketing that we're able to span efficiently." As such, when Defendants eventually dismissed no-touch channel weakness as temporary and minor in August 2025, investors had no reason to doubt Defendants' representations and were inevitably misled.

85. On August 11, 2025, monday.com published its second-quarter FY 2025 results and conducted an earnings call. On the call, analysts questioned Defendants about softness in the Company's no-touch business associated with changes to Google's search engine. Though Defendants acknowledged weakness in this channel, they repeatedly mischaracterized its magnitude, duration, and reparability.

86. Defendant Glazer assured investors that the deterioration was fleeting and already being remedied, stating:

> [W]e are seeing some softness within the down market due to the changes in the Google algorithm, *but this is temporary, we believe, and we're already taking actions proactively to address this. And we believe this is going to be recovered going into the second half of the year*. Overall, our enterprise momentum, the record large customer additions, and continued expansion within our fastest growing segments provide us with a lot of confidence, and we feel very comfortable with the second half of the year.

(Emphasis added.)

87. When asked directly about remediating the impact from AI-generated search responses on paid-search and customer acquisition costs, Defendant Mann minimized the impact, stating:

> *[I]t's not something we didn't see before. It's now -- it's not a huge impact that we see on performance marketing.* And we have a lot of room to grow in other areas, and we can optimize for that. And so we're also doing a lot of AIO in AI, and what's being searched by people in AI, and that they find us there. But generally, it's *not such a big impact right now when we can mitigate it in many different ways.*

(Emphasis added).

88. Later on the call, Defendant Mann reiterated further that:

- . . . and like I said before, *it's not such a significant impact until now, not -- nothing we didn't see before. So it's just a matter of budget allocation and scaling on areas that we improve on.*
- *So it's something we can improve and iterate quickly. So yes, it's not that big.*
- … the better high-quality customers still click on Google and add. *If you're looking for a solution such as a CRM or project management, you're going to reach us, okay? So the drop that we see is just on volume because they are experimenting with AI on top. And it's not that significant for the higher quality of customers. So it's more volume than quality. And we can get that from many other areas. So again, like I don't, I think we can mitigate that relatively quickly.*

(Emphasis added.)

89. Defendant Zinman went further, assuring that the impact was immaterial, stating:

> As I mentioned, the enterprise part of the business is performing well according to our expectations, summarized in the first half of the year. We saw some weakness in the lower side of the business. Part of it is because of the Google changes. Part of it is maybe some other trends that it's kind of hard to understand kind of what exactly they're coming from, but we see a little bit of weakness regardless of the Google search.
>
> And look, we try to be as transparent as possible about the index we see from the search engine. *It's just not that material right now, but it's a start of a trend . . .*

> Currently, in terms of, I don't -- we don't have the exact percentages, but it's *very, very low, almost insignificant*, but it has some effect in our ability to acquire some part of the lower end of our customer base.

(Emphasis added.)

90. Defendants' statements in ¶¶85-89 were materially false and misleading when made. Defendant Glazer's assertion that the no-touch softness was "temporary" and would be "recovered going into the second half of the year," as well as Defendant Mann's and Zinman's characterizations of the impact as "not that big," and "almost insignificant," misrepresented a decline that was already well advanced and still worsening. Defendants knew, when they made these statements, that the decline reflected a lasting change in how prospective customers used search engines, away from paid search and toward AI-generated answers, and increasingly away from search engines altogether as users progressively began running searches on AI chatbots.

91. Indeed, Interviewee 1, who ran the Company's CRM go-to-market strategy for North America until June 2025, stated that even during his tenure, the Company's paid search-driven top of funnel had been "deteriorating very rapidly," that "[t]he yield on all those dollars going to Google was just plummeting," and that "the customer acquisition cost from that kind of PLG [product-led-growth] top-of-funnel marketing was going up rapidly during my time there." Interviewee 1 further noted that the Company's "cost to that top of the funnel has really been impacted by the overall behavioral change that people are doing their research more and more in ChatGPT and less in Google Search words." These were not temporary shifts, but permanent changes that threatened persistent disruption in the Company's no-touch channel.

92. Further, Defendants misled investors about the impact of changes to search on the Company's business by saying it only affected the "lower side of the business" or smaller SMB accounts. However, Defendants knew that such SMB accounts had been, and remained, foundational to the Company's growth. Indeed, Defendant George conceded as much a month

later during the September 17, 2025 Investor Day when he affirmed that success in SMB was crucial to their overall enterprise and upmarket growth, stating "because we dominate SMB, we don't want to leapfrog over mid-market. This is where our portfolio resonates pervasively across that segment. So, we're going to double down as we move upmarket, aggressively going into cross-selling in SMB and mid-market, and let the market come to us in enterprise, because that's what it's doing today, there's this gravitational pull."

93. The down-market SMB segment was also the segment most exposed to a decline in new customer acquisition. Interviewee 1 explained that monday.com's concentration in that market carried heavy attrition, stating that "in that SMB sweet spot, they have a lot of churn, they have a lot of non-renewals," which meant the Company had to keep replacing lost customers simply to hold its ground. A sustained deterioration in the channel that supplied those customers was therefore material to the Company as a whole, and not simply, as Defendants characterized it, merely confined to its smallest accounts.

94. Although monday.com's stock price declined on August 11, 2025, this decline did not reflect the full truth, as Defendants simultaneously assured investors that the no-touch channel softness was "temporary," readily mitigated, and would be "recovered going into the second half of the year." These false assurances prevented the market from appreciating the structural and persistent nature of the channel deterioration or rising customer acquisition costs, and maintained artificially inflated stock prices.

95. Analysts reacted positively, echoing Defendants' characterization of the weakness as temporary:

- Canaccord Genuity: "management expressed confidence that they can circumvent these issue with strategic reallocation of marketing resources . . . we likewise think it's going to be a temporary headwind, as marketing strategies will adapt, content

will be optimized for answer engines, and spend will be aimed at the most efficient channels."

- J.P. Morgan: "The company observes 'some softness' within the down-market segment, partially due to the Google algorithm changes with the introduction of AI Overview technology, which can limit traffic back to a website such as Monday.com, but believes this is temporary, while Monday continues to report enterprise momentum."

- Oppenheimer: "low-touch/SMB customers showed some weakness, and CRM/Dev net adds moderated somewhat . . . [but] [g]iven management's track-record/execution, we're comfortable the needed adjustments will be made, especially considering monday.com's growing enterprise/up-market focus (CRO/CMO, continued sales hiring, product/packaging) and cross-sell opportunities (CRM/Dev/Service/AI-capabilities)."

- William Blair: "Management indicated that this is a minor and temporary dynamic that can easily be remedied in the coming months through budget reallocation to other scaled channels"; and "Management believes the headwinds are a minor and temporary issue that it can remedy in the coming months through reallocation of performance marketing spend to other scaled channels . . . as Monday increasingly moves upmarket, we believe the search headwind on SMB should not have a big impact on the company's performance."

- Wolfe Research: "MNDY attributed these headwinds to updates GOOGL made in the algorithm in the quarter, as well as some changing search trends . . . Management remains confident in strong RPO (internally tracked), supporting their conservative outlook. We believe the current share downdraft dramatically over-estimates the actual business impact"; and "[t]he team stressed their ability to react quickly to changing dynamics, characterizing recent noise on SEO as a temporary disruption from strategic repositioning."

**b. September 17, 2025 Annual Investor Day**

96. On September 17, 2025, at the Company's annual Analyst & Investor Day, monday.com's Chief Marketing Officer, Defendant Beber, directly addressed the impact of AI-driven changes to paid search on the Company's no-touch channel, dismissing it as trivial and stating:

> . . . the emphasis on them, I think, has been outsized, relative to the impact on our actual business, which is *quite de minimis… Google represents about 10% of new. But when we look at the category, overall, the category has seen about a 16% decline in clicks, where we've only seen a 9% decline in clicks*. Why? Because

> we're really good at growth marketing. So, *we've actually been gaining share as it contracts* . . .

(Emphasis added.)

97. Defendant Beber's statements in ¶96 were false and misleading for the reasons stated above in ¶¶85-89 and for the following additional reasons. His representation that the impact on monday.com's "actual business" was "quite de minimis," and that the Company had "actually been gaining share as it contracts," misrepresented the persistent and structural deterioration in the no-touch channel that had a material impact on the Company's growth trajectory. Further, Defendant Beber's comparison of monday.com's decline in clicks to overall product category decline in clicks omitted the Company's outsized reliance on no-touch performance marketing relative to its peers, resulting in a far greater impact on monday.com's business than to others. Interviewee 1 confirmed that "a lot of the marketing budget with monday.com in general was going to search term words." Interviewee 1 also rejected the minimization of Google paid search as only driving 10% of the Company's ARR, stating that "[n]o matter what you call it, the cost of a marketing qualified lead going over $500, and your average deal size, there's a lot going on there with the cost of sale and customer acquisition," and that "[t]hose are not good underlying, healthy foundations." Interviewee 1 further noted that users were increasingly bypassing Google for ChatGPT and similar tools, and that "you can't buy that spot in Google for people who are getting their information from ChatGPT first."

98. Analysts again reacted positively to Defendants' misstatements, and echoed Defendants' minimization:

- DA Davidson: "With regards to, the impact of Google Search changes, monday.com indicated it has performed better than industry peers which saw a 16% decline in click rates compared to a 9% decline for monday.com. Management again highlighted it can reallocate spend away from Google Search."

- Wolfe Research: "Management reiterated that SEO concerns have been de minimis to the business, with Google search contributing only ~10% of new ARR. While the broader category has seen a 16% decline in clicks, monday's decline was just ~9%, and management suggested investor focus on SEO has been outsized relative to its actual business impact."

- Canaccord Genuity: "management provided reassuring context: Google Search currently accounts for only ~10% of Monday's new ARR, and while search clicks are down ~16% industry-wide, Monday's traffic has fallen just ~9%, highlighting relative resilience… Bottom line, while changes in discoverability are real, we believe Monday can adapt."

- TD Cowen: "Mgmt highlighted it is alleviating top of funnel pressures from search via its other 55 customer acquisition channels, notably AI search engines and video channels."

- William Blair: "With all the noise around search headwinds, Monday clarified that search only accounts for about 10% of its new ARR… As Monday focuses more on cross-sell, expansion, and upmarket traction, we expect search to become even less relevant. We were also encouraged to hear that Monday is not losing share in search as the category has seen a 16% decline in click rates, while Monday has only seen a 9% decline… We came away from the investor day more encouraged on Monday's long-term positioning, and believe the near-term challenges are largely temporary and not competitive or structural."

### c. November 10, 2025 Earnings Call

99. On November 10, 2025, Defendants published their third quarter fiscal 2025 results. On the corresponding earnings call, Defendant Zinman represented that the pressure on the Company's top-of-funnel had stabilized by the end of the quarter and that Defendants' remedial actions had succeeded, stating:

> Looking at Q3, top of funnel trends were choppy overall. We saw some continued volatility in paid search performance. *However, the good news are that towards the end of the quarter, we saw encouraging stabilization in new sign-up and top of funnel.* So overall… *the pipeline remains healthy… we remain confident that all the actions that we've done in terms of top of the funnel, how we rebalanced our acquisition channels and all the investment we've made in the last quarter, we paid off going forward.*

(Emphasis added.)

100. During the same question-and-answer segment, Defendant Zinman represented that the Company's paid search acquisition channels had stabilized and that its pipeline was growing to plan, stating:

> Our Google AdWords channel accounts for less than 10% of new revenue. And overall . . . we saw some choppiness Q3, but towards the end-of-the quarter, *we saw stabilization. And that's across Google AdWords and across all other channels, we see very healthy double funnel activity. Also, the pipeline looks very healthy, it's growing according to our plans. So look, I think overall, we feel confident going forward with our acquisition strategy.* And also, we also mentioned during the Investor Day the quality over quantity. We continue to see a trend of this, high quality customers, bigger lands, more expansion, high retention. *So overall, we feel confident about the strategy and confident about our ability to continue and acquire new top of funnel activity.*

(Emphasis added.)

101. On the same call, Defendant Glazer confirmed: "*we have signs of stabilization in top of funnel at the end of the quarter that we are encouraged by that going into the fourth quarter and into next year*."

102. Defendants' statements in ¶¶99-101 were false and misleading for the reasons stated above in ¶¶85-89 and ¶96 and for the following additional reasons. Defendants went beyond minimizing the no-touch channel weakness, representing instead that it had abated. Defendant Zinman stated that the Company "saw encouraging stabilization in new sign-up and top of funnel," that it "saw stabilization" "across Google AdWords[12] and across all other channels," and that the "pipeline remains healthy" and was "growing according to our plans." Defendant Glazer assured that the Company saw "signs of stabilization in top of funnel," which is where the no-touch channel operated. In truth, the channel had not stabilized due to the permanent underlying shift in search user behavior toward AI-generated answers in search engines and toward tools such as ChatGPT.

---

[12] As a reminder, Google AdWords is Google's paid search platform.

Three months later, Defendants admitted that the deterioration "just continues," that the Company "didn't see the improvement that we expected to see," and that they expected the environment to remain "choppy" through 2026 with no "rebound in performance marketing or top-of-funnel activity." Given that timing, Defendants were at a minimum deliberately reckless in representing that the softness had stabilized when their contemporaneous internal data showed otherwise.

103. Despite lowered guidance, analysts again reacted positively and accepted Defendants' stabilization narrative:

- Cantor: "Towards the end of the quarter though, management saw positive stabilization in new sign-ups and top-of-funnel, with positive signals around pipeline health."
- Piper Sandler: "The SMB motion was impacted by 'choppiness' with Google Ad words during the quarter that has since stabilized."
- Wolfe Research: "management noted encouraging stabilization in late September/October that provides greater long-term comfort."

**d. Risk Disclosures in 20-F Reports**

104. Since monday.com is a foreign private issuer, it does not file quarterly reports with the SEC and is not required to update its risk disclosures between annual reports. The Company's only substantive risk disclosures appear once a year, in the Risk Factors section of its Annual Report on Form 20-F. During the entire Class Period, that meant the FY2024 20-F, filed March 17, 2025 contained the operative risk disclosures.

105. That report described the threat to the Company's search-driven customer acquisition as purely hypothetical—and as limited to "traditional" search. Under the heading "We rely on traditional web search engines to direct traffic to our website through search engines and networking sites," the FY2024 20-F warned only that "*[i]f* search engines modify their algorithms or design layouts, our website *may* appear less prominently or not at all in search results, which

*could* result in reduced traffic to our website;" and "*[i]f* we are listed less prominently or fail to appear in search results for any reason, visits to our website *could* decline significantly, and we *may* not be able to replace this traffic." (Emphasis added). These vague disclosures said nothing about AI-generated search results that were continuously disrupting monday.com's no-touch, paid search channels throughout the Class Period. As such, the only risk warning investors received at any point during the Class Period described a vague, hypothetical future risk all while Defendants knew the Company was experiencing an active, present disruption in its no-touch channels and in paid search due to the AI-related changes in search engines as described above.

106. These risk disclosures were materially false and misleading when made. A vague warning about what "may" or "could" happen "if" search engines change is misleading when the change has already happened and the harm is already underway. By August 11, 2025, Google's AI Overviews had rolled out worldwide, traffic to monday.com's website was in sustained decline, and Defendant Glazer conceded on that day that the Company was seeing "some softness within the down market due to the changes in the Google algorithm." Further, as Interviewee 1 noted, these issues were already occurring during his tenure at the Company, which predated the Class Period.

107. In fact, Defendants' own later revision confirms that Defendants knew this disclosure was insufficient. In the FY2025 20-F, filed March 13, 2026—after the Class Period ended and after Defendants admitted the deterioration was structural—Defendants rewrote the disclosure to warn of "our reliance on web search engines, both traditional *and AI generated*, to direct traffic to our website." It further updated its disclosure to read, "If search engines modify their algorithms, *AI-models*, or design layouts, our website may appear less prominently or not at all in search results, which could result in reduced traffic to our website, and we may not be able

to replace this traffic. For example, *we have experienced declines in web traffic from google searches, primarily due to AI-generated search updates and algorithm updates, and we may experience similar issues in the future*." This also serves as a post-Class Period admission by Defendants that the no-touch channel deterioration was real and material to the Company. (Emphasis added).

**2. Defendants Announced and Repeatedly Reaffirmed a $1.8 Billion FY 2027 Revenue Target**

**a. September 17, 2025 Annual Investor Day**

108. During the September 17, 2025 Investor Day call, Defendant Glazer announced a $1.8 billion revenue target by FY 2027, based on then-current trends that the Company allegedly was seeing, stating:

> *And this is probably one of the slides, maybe the slide that you've all been waiting for. This is our number for fiscal year 2027.*
>
> *And we believe, and we are confident that we are going to achieve $1.8 billion in fiscal year '27. And why we are confident in that? Everything that you heard until now from the multiproduct that we have, the platform that we continue to invest with mondayDB, the fact that we are leveraging AI and capabilities into -- layered into our platform, the fact that we are enhancing the enterprise customers' capabilities, which means bigger and larger customers will continue to buy monday.*
>
> *And this all gives us the confidence that we will continue to grow the business, driving durable revenue growth at scale going into $1.8 billion in fiscal year '27.*

109. In response to an analyst's question regarding how investors should think about the attainability of the $1.8 billion FY 2027 revenue target, Defendant Glazer responded:

> *You should think about that as a base case. This is what we believe we can achieve…* This is not taking into account the fact that AI is going to generate significant ARR, in terms of the next few years because monetization will only start next year. *So you should think about it as base case and something that we would like to drive and achieve over time.*

(Emphasis added.)

110. Defendants' statements in ¶¶108-109 were false and misleading when made. The announcement of the $1.8 billion target gave the market the false impression that monday.com's revenue and growth channels were healthy, when the channels essential to that growth were deteriorating as described above – as Defendants well knew. Although the target was forward looking, Defendants expressly grounded it in present conditions including purported multi-product success, touted AI adoption figures, and enterprise momentum. Defendant Glazer's description of the target as a "base case" compounded the impression that it rested on conservative assumptions, when the Company's own contemporaneous data reflecting weakness contradicted those assumptions.

111. Moreover, according to the FEs, there was no internal plan to meet Defendants' targets but instead, internally, sales representatives were repeatedly missing their targets. For instance, as alleged in ¶¶57-73, FE-3 stated that sales employees were never given any kind of plan for how to reach targets, and that when they "constantly" asked how they would be met, management's response was simply "you'll figure it out." FE-1 added that "the idea wasn't sold very well to us internally," and noticed a "significant" slowdown in expansion and saw a lot of customers reducing their usage during their last year at the Company from March 2025 to March 2026. FE-1 also stated that the customer success team was "always feeling like the communication being shared was that we weren't hitting targets," meanwhile employees saw public headlines stating that the Company was exceeding them, which they found "confusing." And as discussed above, the Company was ramping up its head count while existing employees were sitting idle.

112. In addition, Interviewee 1, stated that the Company faced a "product market fit gap" and that "monday's not any node on that enterprise architecture," identifying that the Company's aspirations to grow into a full-fledged enterprise solution was farfetched, as the Company

remained heavily reliant on the SMB market driven by the no-touch channel to spur its growth. Indeed, the Company's enterprise expansion was slowing. As such, Defendants had no reasonable basis for announcing and reaffirming this target.

113. Analysts adopted Defendants' view of the target as a credible baseline:

- DA Davidson: "The big number from the analyst day was the FY27 revenue guide for $1.8B implying 20% Y/Y growth over FY26 consensus estimates," and "The FY27 revenue guide represents a base case for MNDY."
- J.P. Morgan: "Monday provides a 'base case' interim outlook that calls for revenue of $1.8B in FY27 (in-line with consensus), which implies a ~21% revenue CAGR."
- Wolfe Research: "The money slide was the updated FY27 revenue target of $1.8B."
- William Blair: "we believe this is an achievable initial estimate, with management indicating it is a baseline case."

### b. November 10, 2025 Earnings Call

114. On November 10, 2025, during the third quarter fiscal 2025 earnings call, Defendant Mann reaffirmed the $1.8 billion target that had been introduced at the September Investor Day, stating:

> *In Q3, we delivered another quarter of strong results and disciplined execution, putting us firmly on track towards our Investor Day revenue target of $1.8 billion of FY '27.* We saw robust net additions of over $100,000 plus and $500,000-plus paying customers, reflecting the strength of our go-to-market engine and the expanding demand of our platform. We also reported our largest ever non-GAAP operating profit, reinforcing our ability to scale efficiently while continuing to invest in innovation.

(Emphasis added.)

115. During the question-and-answer segment, Defendant Glazer reaffirmed the target multiple times:

> So we are going to provide our initial expectation for fiscal year 2026 in our next quarter earnings. And I think in the Investor Day, we provided a good outline. *We said that we are going to be $1.8 billion by fiscal year '27 and we are committed to achieving this number and to the guidance we have provided during the Investor*

> *Day. So -- and this is something that not only we are growing on the revenue, but also expecting operating and free cash flow margin to expand.*
>
> ***
>
> *So I think I mentioned it earlier, but if you think about where we're going to be in fiscal year '27, we said that we are going to achieve $1.8 billion in revenue, we feel very confident with that. We feel very confident with the number based on everything that we see today. And this is something that we -- when we made the assumptions we took into account the trends that we see today we made some assumptions about the cross-sell motion, the new products that we are launching to the market. The fact that AI is going to be monetized to a certain extent, and the fact that we are going to expand within existing customer base. So having all of this into -- taking all of this into account, we feel that the $1.8 billion in fiscal year '27 is achievable. In the interim, we are confident with the consensus number for next year as well.*
>
> ***
>
> So the cross-sell motion is going to be very strong between, for example, service and work management, CRM will continue to be strong with the monday campaign that we introduced just recently. We are expecting some revenue from AI product… *[S]o taking all of this into account, provide us with the confidence on going into $1.8 billion in fiscal year '27.*

(Emphasis added.)

116. Defendants' statements in ¶¶114-115 were false and misleading for the reasons stated above in ¶¶108-109 and for the following additional reasons. Defendant Mann's representation that third quarter results put monday.com "firmly on track towards our Investor Day revenue target of $1.8 billion of FY '27," and Defendant Glazer's reaffirmations that the number was "achievable" and that the Company "feel[s] very confident with the number based on everything that we see today," gave the false impression that the Company was seeing no material weakness in its growth. Defendants again grounded the target in present fact, with Defendant Glazer stating that "when we made the assumptions we took into account the trends that we see today."

117. The trends the Company was actually seeing were that the no-touch channel deterioration had persisted, and in sales, as described by FE-2, "no one hit [their goals]" and "[m]id-market definitely didn't hit their segment targets" at the end of 2025. Defendants' confidence in the target was not merely optimistic, but unfounded and contradicted by contemporaneous internal conditions, such as declining customers and customer usage.

118. Analysts remained bullish on the strength of Defendants' reaffirmations, and the stock price remained artificially inflated:

- DA Davidson: "management remains confident in the FY27 revenue guide for $1.8B and was notably positive about its move upmarket, better than expected AI adoption, and multi-product opportunity."
- TD Cowen: "reiterated its FY27 rev target of $1.8b that calls for ~21%+ 2-yr CAGR, making valuations highly attractive."
- Wolfe Research: "management reiterated their commitment to the $1.8B FY27 revenue target and expressed confidence in FY26/FY27 linearity in consensus estimates."
- William Blair: "Monday signaled that it was confident in consensus estimates for 2026 and reiterated its 2027 revenue target of $1.8 billion in revenue."

### 3. Defendants Overstated Adoption of Their New AI Products, Characterizing Them as Durable Growth Drivers

#### a. September 17, 2025 Annual Investor Day

119. On September 17, 2025, at the annual Analyst/Investor Day, Defendant Zinman touted the Company's alleged momentum supposedly driven by its recently launched AI features, stating:

> Already, we've seen amazing traction with AI features that we've launched. Up to date, there's already over 67 million AI actions on our platform. In addition to that, in the past 9 months, we've been very busy, the busiest we've ever been as a company, working very hard to create new products and add add-ons to our existing products. We launched monday sidekick, which Daniel is going to present today, already 45,000 actions in monday sidekick alone. We launched monday vibe, which is essentially a vibe coding platform on top of our platform. Already 7,000 apps were built in just 2 months. And with monday magic, which helps you build

> solutions, 2,000 solutions were built in less than 3 months. *We've never seen traction like this in any feature we've released. Our customers are thirsty for AI usage and the adoption is off the charts.*

(Emphasis added.)

120. On the same call, Defendant Glazer characterized the Company's new AI products as a durable growth driver, stating:

> *But we continue to invest in platform and AI. This is something that is very important for us and the presentation of Daniel and Roy and Eran spoke about it and even Casey, this is a growth driver and innovation is in the core of everything we are doing, and we will continue to invest in innovation.* We continue to invest in our product suite. We have currently four product lines, and we have a lot of use cases in between the product lines. There is a white space, thousands of use cases, 200 industries across 200 territories. We'll continue to invest in the product line definitely.

(Emphasis added.)

121. The statements in ¶¶119-120 were false or misleading when made. Defendant Zinman's statements that "[w]e've never seen traction like this in any feature we've released" and that AI "adoption is off the charts," together with Defendant Glazer's characterization of AI as a "growth driver," portrayed AI as a cornerstone of durable growth when Defendants had no reasonable basis to believe these products would generate meaningful revenue. The figures Defendants cited measured activity rather than real demand, reflecting usage of capabilities that, at the time, the Company supplied to customers at little to no cost. Further, FE-2, illustrated how difficult it was to sell the AI products to customers, describing the products as "really confusing," difficult to explain what they were, and stated that their colleagues were equally confused. Interviewee 1 outlined that AI was "not a big money maker for [monday.com]" and noted that the Company was "banking on AI being the silver bullet for upsell." Defendants' disclosures on and after February 9, 2026 confirmed that AI users generated only a small fraction of total ARR and that pricing mechanisms for AI use cases remained in flux.

122. Analysts reacted positively to Defendants' statements regarding their AI products:

- DA Davidson: "We attended monday.com's Elevate user conference and accompanying analyst event in New York City and came away incrementally positive around the durability of growth over the long run as new products contribute more to revenue with upside from AI."

- Wolfe Research: "After attending MNDY's 2025 ADay, we walk away incrementally positive on the continued product velocity, new AI features and expanding upmarket traction. Mgmt's main message was 'all in on AI,' positioning the platform to shift from 'managing work' to 'doing work.'"

- Canaccord: "with a bold AI vision, credible and respectable CY27 targets, a new $870M buyback providing support, and clear catalysts in AI monetization, multi-product adoption, and upmarket momentum, we continue to see Monday as one of the more compelling growth stories in our coverage."

- TD Cowen: "We come away with a continued favorable outlook on MNDY given its attractive growth/margin framework, emerging growth levers in new front-office markets, and multifaceted AI innovations."

**b. November 10, 2025 Earnings Call**

123. On the November 10, 2025 Earnings Call, Defendant Mann continued to tout acceleration in monday.com's new AI products, stating:

> The combination of accelerating customer expansion, record profitability *and surging engagement with our AI offering*, positioned monday.com strongly for its next phase of growth. *Our Q3 results follow a highly successful Investor Day where we showcased our evolution into multiproduct and AI-powered platform.* The event drew nearly 1,000 online participants over 4x the viewership from 2023, reinforcing investor confidence in our vision and the significant opportunity ahead as we execute towards our FY '27 goals.

(Emphasis added.)

124. During the question-and-answer segment of the call, Defendant Glazer echoed Defendant Mann, stating:

> *We are only in the early innings of customers that are adopting more than one product. And only, I think it was 6% that we said in Investor Day, and now we're doing much, much better. AI Product engagement is accelerating.* We were focused on educating, and we are focused on adoption of customers in the market,

> and we see a very healthy adoption of AI products that we believe are going to monetize next year in a more significant way.

(Emphasis added.)

125. Later on the call, Defendant Zinman confirmed:

> We see acceleration. Our go-to-market strategy in terms of adding bigger accounts is working really well and we see accelerating on all fronts. In terms of what customers are asking for, so definitely, we see an increase in terms of our profitability, more customers are buying more products. *Definitely more-and-more customers are interested in AI features and AI products. And I think a lot of the new announcements and new features that we launched really resonates with customers.*
>
> *So overall, we see very healthy demand across all customer segments. We see healthy demand with our existing products and specifically with the new AI features that we offered, and we announced during the Investor Day.*

(Emphasis added.)

126. The statements in ¶¶123-125 were false and/or materially misleading for the same reasons as stated above in ¶¶119-120, as well as for the following additional reasons. Defendant Mann's description of "surging engagement with our AI offering," Defendant Glazer's statement that "AI Product engagement is accelerating," and Defendant Zinman's assurance that the Company saw "healthy demand" "specifically with the new AI features," were put forth as evidence that AI would be a durable growth driver for the company, even though these statements only really referenced engagement and interest. None of these statements disclosed that the engagement Defendants were touting was occurring on capabilities the Company supplied at little to no additional charge, or that the Company had yet to establish that customers would pay for them.

127. Analysts credited Defendants' characterization of the Company's AI momentum, and the stock price remained artificially inflated:

- DA Davidson: "management remains confident in the FY27 revenue guide for $1.8B and was notably positive about its move upmarket, better than expected AI adoption, and multi-product opportunity."
- Wolfe Research: "management reiterated their commitment to the $1.8B FY27 revenue target and expressed confidence in FY26/FY27 linearity in consensus estimates, citing accelerating upmarket pipeline, early AI product momentum, and new bundle product offerings driving cross-sell opportunities."
- Piper Sandler: "we remain encouraged by growing upmarket momentum, cross-sell opportunity, new product innovation, and GTM focus led by CRO Casey George."

**G. The Truth Begins to Emerge on November 10, 2025**

128. Upon release of the November 10, 2025 third quarter 2025 results, the truth regarding the deterioration of monday.com's business began to emerge. Although the third quarter results exceeded consensus estimates, Defendants guided fourth quarter revenue to a range of $328 million to $330 million – below expectations and implying deceleration in the Company's projected growth rate.

129. The market reacted as shares of monday.com on November 10, 2025 closed down approximately 12.3%.

130. However, as described above, the November 10, 2025 disclosures were only partial, as Defendants accompanied the disappointing guidance during the accompanying earnings call with misleading assurances that the top of funnel and paid search had seen "encouraging stabilization," that the pipeline was "growing according to our plans," that the guidance reflected mere "timing effects," and that the Company remained "firmly on track" toward the $1.8 billion FY 2027 revenue target. These misrepresentations continued to conceal the structural and persistent nature of the no-touch channel deterioration and rising customer acquisition costs and maintained the Company's artificially inflated stock prices.

### H. The Truth Emerges at the February 9, 2026 Fourth Quarter 2025 Earnings Call

131. On February 9, 2026, Defendants published their fourth quarter and full fiscal year financial results. The release confirmed the deterioration Defendants had spent the Class Period denying. In pertinent part, Defendants revealed:

a. Revenue growth continued to decelerate. Fourth quarter revenue of $333.9 million represented year-over-year growth of 25%, down from 26% in the third quarter of 2025, 27% in the second quarter, 30% in the first quarter, and 32% in the fourth quarter of 2024.

b. Net dollar retention rate fell to 110% from 112% as of December 31, 2024.

c. The number of net adds for paid customers with more than 10 users declined from 5,526 in 2024 to 4,700 in 2025.

d. Comparing Q4 2024 to Q4 2025, year-over-year non-GAAP operating margin fell to 13% from 15%. GAAP operating income fell to $2.4 million from $9.6 million. Adjusted free cash flow fell to $56.7 million from $72.7 million, and adjusted free cash flow margin fell to 17% from 27%.

132. The guidance issued the same day disclosed the scale of what Defendants had concealed. The Company projected first quarter 2026 revenue of $338 million to $340 million, growth of approximately 20%, and full year 2026 revenue of $1,452 million to $1,462 million, growth of 18% to 19%. It projected non-GAAP operating margin of 11% to 12%, down from 14% in 2025, and adjusted free cash flow margin of 19% to 20%, down from 26%. These figures represented a marked decline from prior projections.

133. Despite significantly lowered FY 2026 guidance, Defendants Mann and Zinman continued to misleadingly suggest that the Company was performing well, and were quoted in the press release as saying:

> We delivered another year of strong, disciplined execution in 2025, with 27% revenue growth and a 14% non-GAAP operating margin, while expanding our product portfolio and seeing strong adoption of our AI products. At the same time, we continue to make progress upmarket, as larger customers increasingly adopt more solutions and standardize on monday.com for mission-critical workflows.

134. During the accompanying earnings call, Defendant Glazer highlighted monday.com's long-term growth trajectory as presented at the September Investor Day but rescinded the Company's $1.8 billion 2027 revenue target entirely, stating, in pertinent part:

> *We ended the quarter with $1.5 billion in cash and cash equivalents compared to $1.53 billion at the end of Q3, reflecting [$135 million] of share repurchase executed during the quarter. As of the end of Q4, approximately $735 million remained available under our existing share purchase authorization program.* Adjusted free cash flow for Q4 was $56.7 million and adjusted free cash flow margin was 17%. In fiscal year 2025, adjusted free cash flow was $322.7 million and adjusted free cash flow margin was 26%. Adjusted free cash flow is defined as net cash from operating activities, less cash used for property and equipment and capitalized software costs, plus costs associated with the build-out and expansion of our corporate headquarters.
>
> *Before I discuss guidance for fiscal year 2026, I did want to touch on our approach to guidance moving forward. Our confidence in the underlying fundamentals of the business and our long-term financial trajectory remains unchanged since our Investor Day in September. Given the evolving nature of the AI landscape and the choppiness in the no-touch demand environment, we believe it is responsible to keep our near-term communication focused on what we can execute and deliver with high confidence.*
>
> *As a result, we will no longer be discussing our previously provided 2027 targets, but we'll be centering our discussion on our 2026 outlook, which reflects the continued momentum we see across our AI work platform, new product introductions, and upmarket sales motion.* We remain committed to disciplined execution, which is consistent with our track record, and we will revisit long-term targets when there is a greater visibility and it's appropriate to do so. Let's now turn to our outlook for fiscal year 2026.

(Emphasis added.)

135. During the question-and-answer segment, Defendants discussed the 2026 guidance noting that the slower enterprise growth, longer sales cycles, and shifts in marketing spend contributed to the softer near-term outlook:

> <Q: *Guidance for now reflects what we believe we can execute against with high confidence. It doesn't assume any rebound in performance marketing or top-of-the-funnel activity.* (Glazer)

> *As you rightfully stated, NDR to remain flat at 110%, sorry, by the end of the year. With regards to maybe the margins, we assume that we are going to go in terms of headcount growth of mid-teens.* (Glazer)
>
> *…as we said at the last time we gave guidance, we felt and we believed based on the visibility that we had at the time that the 1.5 number is a number that we are going to achieve. It looks reasonable to us. Since then, there is a lot of noise in the market in terms of macro economy. As we said, our no-touch business continued to be choppy and volatile.*
>
> *We didn't see the improvement that we expected to see. And we see shift in the business and shifting the business takes time. So this is why we thought based on what we know today, that it would be prudent to reset the guidance that we are giving. And we -- given the current macro, as I mentioned, and the demand environment, we believe that it's appropriate to put numbers that reflect what we can execute against, sorry, with high confidence. And this is the reason why we did this adjustment.*
>
> *We are expecting it not to get any better from what we have seen in fiscal year 2025. We didn't see the improvement that we hoped for, or we believe that we're going to see. So we believe it might be choppy. It will – not might be. It will be choppy throughout 2026.*
>
> <A: Eliran Glazer> To your first question, and then I will defer to Roy and Eran. *As I said, due to the macro economy and the choppiness that we have seen, this is the 2027 number is currently off the table, and we are focusing on fiscal year 2026 execution.*
>
> < Zinman> on the second part of the question about AI. *I think most -- look, I feel the whole industry is living and breathing AI and aware of all the changes and improvement. But -- most of our customers, and I don't think we're in a unique position, are still trying to figure out what's the best way to leverage that technology.* And for them, the best way to leverage that technology is use all these systems they're using before where they have most of the data in the context and the workflows. And with that, they're trying and a vendor that they trust and love to use. And on that, they're trying to leverage their capabilities.

(Emphasis added.)

136. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the 2025 conferences, earnings calls, and shareholders calls. On those calls, Defendants continually downplayed persistent weakness in their no-touch channel while touting the Company's continued expansion of its core

platform, AI-driven investments, increasing enterprise adoption and multi-product integration, and repeatedly affirmed monday.com was "on track" on achieving its full year 2027 revenue target of $1.8 billion, while minimizing signs of slowing customer growth, no-touch channel disruption, weaker expansion in existing accounts, rising customer acquisition costs, and persistent no-touch channel weakness.

137. Investors and analysts reacted immediately to monday.com's revelation. The price of monday.com's ordinary shares declined dramatically. From a closing market price of $98.00 per share on February 6, 2026, monday.com's stock price fell to $77.63 per share on February 9, 2026, a decline of about 21%.

138. A number of well-known analysts who had been following monday.com lowered their price targets in response to monday.com's disclosures:

- Capital One dropped their price target by 47% noting that, "[i]mportantly, the $1.8B 2027 revenue guidance that was given in September at their Analyst Day is now off the table (we are at <$1.7B)… The company said that there is no weakness to call out in the core work management product due to optimizations, just general softness down market. cRPO growth decelerated <1% to 31% y/y in 4Q."

- Wolfe Research published a report titled "Monday (not)FunDay" lowering the firm's price target to $95 from $98, highlighting Monday's withdrawn full-year 2027 guidance, commenting, "MNDY posted another mixed quarter with strong upmarket momentum and early AI traction but persistent no-touch headwinds, FY26 guide below cons and withdrawn FY27 targets pressuring results. Valuation now at 1.5x CY27 revenue."

- Baird Equity Research downgraded to neutral commenting, "[w]hile many expected the revenue guide to come in below Street, the reset in margins and removing the 2027 targets were negative surprises."

139. Indeed, the February 9, 2026 disclosures prompted analysts to severely reduce their price targets for the Company: Analysts at Needham dropped their price target from $250 to $125, while TD Cowen cut their price target from $200 to $125, and analysts at both Wells Fargo and Oppenheimer cut their price target from $200 to $130.

140. The fact that these analysts, and others, discussed monday.com's shortfall and below-expectation projections suggests the public placed significant weight on monday.com's prior growth estimates, projected revenue targets, and no-touch channel impact. The frequent, in-depth discussion of these issues confirms that Defendants' misstatements during the Class Period were material.

## V. ADDITIONAL SCIENTER ALLEGATIONS

141. As alleged herein, Defendants acted with scienter in that they knew that the public statements they made on behalf of monday.com were materially false and misleading when made or were deliberately reckless in disregarding or omitting the true facts, which were available to them.

### A. Defendants' Own Words Establish Their Contemporaneous Knowledge of Deterioration in the No-Touch and Self-Serve Channels

142. By Defendants' own account, they observed and consistently monitored deterioration in monday.com's no-touch channel throughout, and even prior to, the Class Period. From the outset, at the August 11, 2025 earnings call, Defendant Mann conceded that the downward trend in this channel was already familiar to management, noting "it's not something we didn't see before." Such statements were admissions that Defendants had been monitoring a known, developing phenomenon, which they misleadingly and/or recklessly characterized to investors as "temporary," "not that big," and "almost insignificant."

143. During the August 11, 2025 earnings call, Defendant Mann touted clear visibility into their internal performance marketing metrics, stating:

> *Like, we have a big brain, and we monitor all the performance stuff. So we see areas that we are more efficient in, so we move resources there.*

And later on the call Defendant Zinman stated:

> I think what gave us a lot of confidence throughout all the years we've been doing performance marketing is one, we don't only do just AdWords [paid search]. So we have a lot of other channels as well. And also, *we monitor every campaign, every click, every expense. So we're not flying blind. Everywhere we feel unoptimized, we optimize. So we know we can optimize. We know we have full visibility into how we spend that budget.*

(Emphasis added.)

144. Defendants' statements at the February 9, 2026 fourth quarter 2025 earnings call similarly demonstrated that they had been observing downward trends in their no-touch, self-serve acquisition channels. Defendant Mann noted that the no-touch headwinds were "the same things we called out before" and that it "just continues." Defendant Mann admitted further that "the cost to acquire and expand self-serve customers have increased over the past year, and the returns on those investments have been below historical levels." This admission, by its terms, reaches back across the preceding twelve months, and encompasses the entire Class Period. It therefore serves as an acknowledgement that the very trend that Defendants characterized as "temporary" and "insignificant," and "stabilized" was, throughout and prior to the Class Period, an ongoing and worsening rise in the Company's cost to acquire customers driven by persistent no-touch channel weakness.

145. Defendant Glazer's concession on February 9, 2026 that "[w]e didn't see the improvement that we expected to see" in the no-touch channel is a further admission that Defendants were monitoring the channel against internal expectations throughout the Class Period.

146. As such, the only reasonable inference is that Defendants knew, or recklessly disregarded, the structural nature and magnitude of the no-touch channel deterioration while it was ongoing, and while they were publicly characterizing it as a temporary issue. Indeed, Defendant Mann conceded that these problems were "nothing we didn't see before," and Interviewee 1

confirmed that AI-related impacts to monday.com's paid search efforts and customer acquisition costs were on the rise even prior to the Class Period. The changes in search such as Google's AI-Overviews or search users' increased utilization of AI chatbots to run searches were inherently structural and permanent, and Defendants had no reasonable basis to suggest otherwise.

### B. Individual Defendants Touted the Company's BigBrain Analytics System and Admitted to Monitoring Internal Data

147. Throughout the Class Period, Defendants touted BigBrain, the Company's proprietary internal analytics platform, through which – in Defendant Zinman's own words – "we monitor every campaign, every click, every expense." Not only did such statements constitute direct admissions that Defendants themselves monitored internal performance marketing data, but they also misled the market into believing that Defendants' statements were credible and based on sound internal data.

148. Defendant Glazer further described on the November 10, 2025 earnings call how the Company's spending decisions were made in real time on the basis of BigBrain's data, proclaiming "due to our BigBrain capabilities, when we see high returns, we are investing in performance marketing, and we see immediate dollars."

149. Indeed, in responding to direct questions regarding paid search and the no-touch channel, Defendants directly referenced internal data, confirming that they were monitoring this channel closely. For instance, at the September 2025 Investor Day, Defendant Beber reassured the market about paid search weakness by stating that the "category has seen about a 16% decline in clicks, where we've only seen a 9% decline in clicks," again affirming that granular data in this channel was being collected, tracked, and seen by Defendants. Likewise, Defendant Zinman's representation on the November 2025 earnings call that the Company saw "encouraging stabilization in new sign-up and top of funnel," where the no-touch acquisition channel operated,

again strongly evinces that the Individual Defendants themselves were monitoring internal data in these channels.

### C. Defendants Knew or Recklessly Disregarded that the $1.8 Billion FY 2027 Revenue Target Was Unlikely to Be Met Based on Contemporaneous Conditions

150. The $1.8 billion FY 2027 revenue target that the Company first announced at the September 2025 Investor Day was not just a projection that simply failed to come to fruition, it lacked a reasonable basis when announced and when repeatedly reaffirmed. Defendants knew at the time that attainment of this projection depended on the continued health of its no-touch acquisition channels that had historically supported a significant portion of the Company's new customer growth. Defendants' close monitoring of these channels, tracked through their BigBrain internal analytics platform, demonstrated this channel to be persistently impaired, as click-through paid search traffic was declining, and the Company reallocated marketing spend to other higher cost channels, knowing that fundamental changes in search would continue to impact their no-touch channel. Defendants did not genuinely believe the target, actually knew or recklessly disregarded that they had no reasonable basis for making it, and were aware of undisclosed facts tending to seriously undermine its accuracy.

151. Defendants expressly tethered the FY 2027 target to present conditions. Defendant Glazer told investors to treat the $1.8 billion target as a "base case," confirming that this number "took into account the trends that we see today," omitting or recklessly ignoring the structural damage that had persisted, and would persist indefinitely, in their key no-touch channels.

152. Moreover, the timeline of Defendants' statements about the target confirms the absence of a reasonable basis for the Company's announcement of the target at the September 2025 Investor Day. Indeed, just three months after reaffirming that the Company was "firmly on track" to meet the FY 2027 target at the November 10, 2025 earnings call, Defendants promptly

withdrew the target entirely on February 9, 2026, strongly supporting the reasonable inference that they knew at the time of the November 2025 earnings call that the target was not attainable. Further, this withdrawal did not occur as a result of unforeseen circumstances, as persisting AI-related search disruptions to the Company's no-touch channels – which were crucial to the attainment of the FY 2027 target – were well known to and closely monitored by the Company at the time that the target was introduced and reaffirmed.

153. Defendants' practice of announcing large revenue goals without reasonable basis was established internally as well. As alleged in ¶¶57-73, executive management had internally committed monday.com to reaching $10 billion in ARR within five years, announced at Company-wide meetings beginning in August 2024, without ever explaining the basis for it. FE-3 stated that sales employees were never given any kind of plan for how to reach that goal, and that when they "constantly" asked how it would be met, management's response was simply "you'll figure it out." FE-1 stated that the goal did not seem reasonable to employees and that "the idea wasn't sold very well to us internally."

154. At the September 17, 2025 Investor Day, Defendants also touted contemporaneous metrics, including remaining performance obligations ("RPOs"),[13] that they stated provided "predictability and visibility into the numbers of monday" in support of their $1.8 billion target. However, less than two months later, on the November 10, 2025 earnings call, Defendant Glazer conceded that the RPO figures had been revised downward, stating "upon further review – post-Investor Day, we made some adjustment to ensure consistency and accuracy across period . . . as part of our auditor's review." Defendants thus presented investors with a metric that initially

[13] RPOs are defined by the Company in their February 9, 2025 Press Release as "the aggregate amount of transaction price allocated to performance obligations that are unsatisfied or partially unsatisfied at the reporting date, including both deferred revenues and non-invoiced amounts expected to be billed and recognized in the future."

appeared to support the $1.8 billion target, yet even this metric was flawed and eventually reduced upon review by an auditor.

### D. The No-Touch Channel Was Core to the Company's Operations

155. Defendants' no-touch, self-serve acquisition funnel was foundational to the Company's go-to-market strategy and a core driver of the Company's rise to prominence. From the beginning, the Company focused an outsized portion of its acquisition engine around paid search, online marketing, and a self-serve funnel where customers were primarily acquired with little to no human interaction.

156. The centrality of the paid search channel in particular was emphasized repeatedly during investor conferences and earnings calls throughout the Class Period. Indeed, the Company's own annual reports confirmed that monday.com's success depends on its "ability to attract customers through paid and unpaid internet search results on web search engines, such as Google," and that the "prominence of our website in response to internet searches" is "a critical factor in attracting potential customers to our products."

157. Interviewee 1 confirmed that "a lot of the marketing budget with monday in general was going to search term words" and "monday's paying big dollars to Google to move to the top of the search results and usurp that spot from Asana." The Company would not pour this kind of marketing spend into a channel that was not central to its business.

158. Analysts consistently asked pointed questions and reported on paid search weaknesses as they arose. Each time, Defendants provided misleading reassurances that were detailed and specific – characterizing any downward trend as fleeting and immaterial, and masking the weakness by invoking pipeline health, enterprise growth, and distracting investors with a slew of new AI product announcements.

159. Further, as noted above, Individual Defendants themselves admitted to keeping close watch over their no-touch channels via their BigBrain system, closely monitoring click-through and paid search sign up data, further demonstrating that such channels were core to the growth of the Company's business.

160. Defendants themselves quantified (in part) the Company's reliance on this channel, telling investors that Google search accounted for approximately 10% of new ARR. Interviewee 1, who ran the Company's CRM go-to-market strategy for North America, described the concentration in blunter terms, stating that "a lot of the marketing budget with monday in general was going to search term words" and that monday.com was "paying big dollars to Google to move to the top of the search results and usurp that spot from Asana." monday.com would not have spent such a large portion of its marketing budget on paid search if it was not core to their business.

161. Therefore, the no-touch channel was not a peripheral acquisition channel; it was the mechanism by which monday.com acquired a significant portion of its new customers. The channel was tracked in real time through BigBrain, and it was frequently discussed and questioned by analysts at all of the Company's conferences during the Class Period. Defendants repeatedly answered questions regarding this channel with specific numbers drawn from internal data. Given these facts, it is not plausible that Defendants were unaware of the condition of this channel while describing that condition to investors.

### E. Defendants' Reallocation of Marketing Spend Away from No-Touch Channel Confirms Their Knowledge of Its Structural Impairment

162. Defendants' stated efforts to reallocate their marketing spend to other channels and away from the no-touch channel evinced that they knew that softness in this channel was ongoing and persistent. Even as Defendant Beber dismissed the impact of the no-touch channel weakness as "quite de minimis" at the September 2025 Investor Day, he simultaneously confirmed that the

Company was shifting its marketing investment to sales-led-growth, video, and social media. If the Company thought that their no-touch channel erosion was temporary and immaterial, there would be no reason to drastically shift their marketing strategy in this way.

### F. Former Employees Confirm that the Deterioration Was Known Internally and Was Escalated to Management

163. As set forth in ¶¶57-73, former monday.com employees confirm that the Company's deteriorating growth was visible internally, was raised with management, and was inconsistent with what Defendants were telling the market.

164. FE-2, a Mid-Market Account Manager employed from June 2024 through November 2025, stated that their team raised expansion problems and difficulties hitting targets with management directly. According to FE-2, "[w]e'd share all the time it was difficult and things weren't going well," and their manager would tell them he heard them and say he would bring it back to leadership, but nothing came of it. FE-2 stated that "leadership knew" about the growth issues, and that "[t]hey knew that the business wasn't doing well."

165. FE-3, who worked at monday.com from April 2021 through June 2025 as an account executive and then an account manager, described the granular internal reporting available through BigBrain, stating that BigBrain tracked "everything," including usage, spend, account tier, and whether there were new users on the account, and that regular account status reports available on Big Brain were updated daily and could be accessed by any employee.

## VI. LOSS CAUSATION AND ECONOMIC LOSS

166. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class (defined herein). During the Class Period, Plaintiff and Class members purchased monday.com's ordinary shares at prices that were artificially inflated by Defendants' misconduct, as alleged herein.

167. During the Class Period, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of monday.com's ordinary shares and operated as a fraud or deceit on Class Period purchasers of monday.com's ordinary shares by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market and the price of monday.com's ordinary shares materially declined as the prior artificial inflation came out of the price over time. As a result of their purchases of monday.com's ordinary shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws.

168. monday.com's stock price fell in response to the corrective events, as alleged *supra*. On these dates, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning monday.com's forecasting processes and growth guidance.

169. In particular, on November 10, 2025 and on February 9, 2026, monday.com issued disclosures that contradicted previous statements about its then-current business operations and financial health. These disclosures caused monday.com's stock price to decline as the artificial inflation caused by prior misleading statements began to dissipate. In response to each disclosure, monday.com's stock price declined materially and caused damages to investors.

170. As the allegations herein demonstrate, however, the November 10, 2025 disclosure was only a partial materialization of the concealed risks: Despite revealing lower-than-expected guidance, Defendants simultaneously reassured the market that the no-touch channel had seen "encouraging stabilization," that the pipeline was "growing according to our plans," that the guidance reflected mere "timing effects," and that the Company remained "firmly on track" toward

the $1.8 billion FY2027 target. As such, the stock price remained artificially inflated after November 10, 2025.

171. The February 9, 2026 disclosures revealed the whole truth, including the withdrawal of the FY 2027 target, significantly lowered guidance for FY 2026, lowered free cash flow guidance, rising customer acquisition costs, and the persistent and continuing deterioration of the no-touch channel deterioration throughout the year and into 2026.

172. As a direct result of Defendants' disclosures, monday.com's stock price plummeted approximately 21% on February 9, 2026 to a close of $77.63, costing investors over a billion dollars in shareholder value.

## VII. APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

173. The market for monday.com's ordinary shares was open, well developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, the Company's ordinary shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's ordinary shares, relying on the integrity of the market price of such securities and on publicly available market information relating to monday.com. Plaintiff and Class members have been damaged thereby.

174. During the Class Period, the artificial inflation of the value of monday.com ordinary shares was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's ordinary shares to be artificially inflated at all relevant times. When the truth

was disclosed, it drove down the value of the Company's ordinary shares, causing Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

175. At all relevant times, the market for monday's ordinary shares was an efficient market for the following reasons, among others:

(a) monday.com's ordinary shares met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) monday.com communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) monday.com was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about monday.com was reflected in and incorporated into the Company's stock price during the Class Period.

176. As a result of the foregoing, the market for monday.com's ordinary shares promptly digested current information regarding the Company from all publicly available sources and reflected such information in monday.com's stock price. Under these circumstances, all

purchasers of monday.com's ordinary shares during the Class Period suffered similar injury through their purchase of monday.com's ordinary shares at artificially inflated prices, and a presumption of reliance applies.

177. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the *United States Supreme Court in Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## VIII. NO SAFE HARBOR

178. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, many of the statements challenged herein are statements of then-existing fact, or contain severable assertions of then-existing fact, and fall outside the safe harbor entirely. As to any statement properly characterized as forward-looking, the safe harbor is unavailable because the accompanying cautionary language was not meaningful: it remained generic and static, warning only that the identified risks "may" or "could" materialize, at a time when the risk had already materialized and Defendants knew that it had. Defendants further made or approved each such statement with actual knowledge that it was false or misleading. Defendants provided investors with revenue projections while at the same time explicitly connecting such projections with present-tense conditions.

179. Defendants provided the public with forecasts that failed to account for decline in growth and acquisition channels and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

180. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, the cautionary statements accompanying them were not meaningful. The warnings Defendants identified were generic, were not tailored to the specific projections challenged here, and remained unchanged even as the risk they described ceased to be hypothetical and began to materialize.

181. To the extent that the $1.8 billion FY2027 revenue target or other such statements may be characterized as forward-looking, Defendants expressly grounded these representations in the Company's presently observed, contemporaneous conditions regarding the health of their business.

182. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of monday.com who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## IX. CLASS ACTION ALLEGATIONS

183. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired monday.com's ordinary shares during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants

herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

184. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, monday.com's ordinary shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by monday.com or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 31, 2024, there were 50.77 million shares of the Company's ordinary shares outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

185. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

186. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

187. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of monday.com;

(c) whether the Individual Defendants caused monday.com to issue false and misleading statements of material fact during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of monday.com's ordinary shares during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

188. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

***Against All Defendants for Violations of***
***<u>Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder</u>***

189. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

190. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

191. During the Class Period, Defendants engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of monday.com ordinary shares; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire monday.com's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

192. Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for monday.com's securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

193. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

194. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of monday.com's internal affairs.

195. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to monday.com's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of monday.com's ordinary shares were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired monday.com's ordinary shares at artificially inflated prices and relied upon the price of the

ordinary shares, the integrity of the market for the ordinary shares, and/or upon statements disseminated by Defendants, and were damaged thereby.

196. During the Class Period, monday.com's ordinary shares were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of monday.com's ordinary shares at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ordinary shares or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of monday.com's ordinary shares was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of monday.com's ordinary shares declined sharply upon public disclosure of the facts alleged herein, to the injury of Plaintiff and Class members.

197. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

198. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's ordinary shares during the Class Period, upon the disclosure of the true facts that Defendants' materially false and misleading statements and omissions had concealed.

## COUNT II

***Against the Individual Defendants***
***for Violations of Section 20(a) of the Exchange Act***

199. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

200. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about monday.com's misstatements.

201. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by monday.com which had become materially false or misleading.

202. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which monday.com disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause monday.com to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of monday.com's ordinary shares.

203. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same,

to cause monday.com to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

204. By reason of the above conduct, the Individual Defendants and/or monday.com are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 3, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Amanda F. Lawrence
Amanda F. Lawrence (AL8804)
156 South Main Street
P.O. Box 156
Colchester, CT 06415
New York, NY 10169
Telephone: (860) 537-5537
Facsimile: (860)
alawrence@scott-scott.com

Nicolas Apter-Vidler
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
napter-vidler@scott-scott.com

*Counsel for Lead Plaintiff Steve Quinn and the Proposed Class*

Brian Schall
**SCHALL, BROWN & SCHWARTZ LLP**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 213-519-5876
brian@schallfirm.com

*Co-Counsel for Lead Plaintiff Steve Quinn and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2026 I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on July 31, 2026, at Colchester, Connecticut.

s/ Amanda F. Lawrence
Amanda F. Lawrence