**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BEN POTTER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MONDAY.COM LTD., ROY MANN, ERAN ZINMAN, ELIRAN GLAZER, CASEY GEORGE, and HARRIS BEBER,<br><br>Defendants. | Case No. 1:26-cv-01956-JMF<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMAND** |

# PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiff Steve Quinn ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, alleges the following as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings made by monday.com Ltd. ("monday.com" or the "Company"), the Company's Co-Chief Executive Officer ("Co-CEO") Roy Mann, the Company's Co-CEO Eran Zinman, the Company's Chief Financial Officer ("CFO") Eliran Glazer, the Company's Chief Revenue Officer ("CRO") Casey George, and the Company's Chief Marketing Officer ("CMO") Harris Beber, analyst and media reports, conference call transcripts, Company press releases, interviews with former Company employees, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

# I. SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities that purchased shares of monday.com's ordinary shares between August 11, 2025, to February 6, 2026, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. §78a, *et seq*. (the "Exchange Act"). This action brings claims against Defendants monday.com, Co-CEO Mann, Co-CEO Zinman, CFO Glazer, CRO George, and CMO Beber, and seeks to recover damages caused by Defendants' violations of the Exchange Act.

2. The crux of this case is that monday.com misled the market about the collapse of its primary method for acquiring customers and then sold investors on a $1.8 billion revenue target built on that broken acquisition engine and other flawed and illusory metrics. Throughout the Class Period, Defendants knew from their own internal data that the marketing channels responsible for the majority of monday.com's new customers were structurally deteriorating. Rather than tell investors the truth, Defendants dismissed the problem as "temporary" and "trivial," later claimed it had stabilized when it had not, and announced—and repeatedly reaffirmed—a revenue target for which they had no reasonable basis. When the truth emerged, monday.com's stock price collapsed, erasing billions of dollars in shareholder value.

3. monday.com sells subscription software that businesses use to organize their day-to-day work. Its products consist of online task managers, dashboards, and trackers, which teams use to assign tasks, track projects, manage customer relationships, and coordinate workflows.

4. The Company's software was designed specifically to work best for smaller companies ("small and medium-sized business," or "SMBs") with more nuanced and varied business needs, requiring more customizable work management software to meet those needs. The SMB market was also more likely to independently search and sign up for monday.com's products and services through the Company's so called "no-touch" channel. The Company had a much

more difficult time luring away larger enterprise companies that were already entrenched in their work management software ecosystems, and as such, monday.com faced intense competition in the enterprise space. In accordance with the Company's "land-and-expand" business model, new customers would initially sign up for monday.com's services on free trials or inexpensive entry-level subscriptions, and the Company would then try to sell them on additional products and more expensive plans.

5. Rather than relying primarily on salespeople to market its products, monday.com relied on the internet to bring in most of its new customers. In particular, the Company invested heavily in "paid search," where monday.com would pay Google (and other search engines) to display its website prominently to users in response to related online search results. A typical example of how this strategy worked is as follows: a prospective customer types a phrase such as "project management software" into Google; next, and as a result of monday.com's payment to Google, that customer would see the website "www.monday.com" at or near the top of their search results page; the customer would then click through to the Company's website, view details about its software, and sign up—all without ever interacting with a monday.com representative.

6. The Company called these internet-driven acquisition channels "no-touch" or "self-serve"[1] channels as no human contact with monday.com was required to acquire a new customer. From a marketing perspective, these channels operated at the "top-of-funnel" in the Company's customer acquisition pipeline—that is, they were very often the first line of exposure that prospective customers had to monday.com's products and services.

7. The Company was highly dependent on the "no touch" channels at the top of the funnel to acquire new customers. Its annual report identifies the "prominence of our website in

---

[1] These terms were used interchangeably by the Company.

response to internet searches" as "a critical factor in attracting potential customers to our products."[2] As Defendant Beber, the Company's Chief Marketing Officer, put it at the Company's September 2025 Analyst & Investor Day: "[p]aid search is really high intent traffic. It converts within days. People know what they're looking for. They search for work management platform. They click on a link. They pay." Since the no-touch channel was the lifeblood of monday.com's business, investors and analysts scrutinized it closely and repeatedly questioned Defendants about the channel's health at earnings calls and conferences throughout the Class Period.

8. monday.com's no-touch model enjoyed some initial success. However, it carried with it a critical vulnerability: it depended heavily on a steady stream of clicks and sign-ups from internet search results. In 2025, the stream of clicks on which monday.com depended began to dry up due to a fundamental change in internet search. As users began running more of their internet searches through artificial intelligence ("AI") programs such as ChatGPT, Google rolled out a feature called "AI Overviews." Now, when a user searches for anything on Google, instead of simply displaying a list of website links in response, Google generates its own AI-written answer and displays it at the top of the results page. As a result, users increasingly started getting what they need directly from Google's AI answer and never clicked through to the websites (like monday.com) listed below the answer. Other search engines also began implementing similar features, such as Microsoft Bing's integration of Copilot AI answers into its search engine. And some users bypassed traditional search engines altogether, opting instead to engage with AI chat tools like ChatGPT.

9. For a company whose customer acquisition depended on search-engine click-throughs, these changes in online search struck at the foundation of monday.com's business. The

---

[2] monday.com Ltd., Annual Report (Form 20-F) (Mar. 17, 2025) ("FY2024 20-F") at 114.

yield on each marketing dollar fell and the cost per qualified lead rose. Fewer clicks meant fewer sign-ups, a higher cost to acquire new customers, and slower growth. And because this shift to AI-generated answers was a fundamental change in how internet search works, the damage to monday.com's no-touch channel was structural and durable, not superficial and short-lived, as Defendants claimed.

10. Defendants were aware of this problem, and they watched its effects ripple out in real time. The Company tracked its marketing performance through an internal analytics system called "BigBrain," which, according to Defendants, measured the click through traffic to its website, sign-up rates, and conversion trends in the no-touch channel.

11. However, rather than disclose the truth regarding the structural deterioration of monday.com's crucial no-touch channel, throughout the Class Period, Defendants made materially false and misleading statements, and/or omitted material facts from the public. They minimized the erosion in their no-touch channel by falsely portraying it as temporary, trivial, and quickly remedied, and later falsely assured investors that the channel had stabilized when it had not.

12. These included Defendant Glazer insisting that the changes in Google's search functionality and its resultant impact on paid search was "*temporary*" and that the no-touch channel softness would soon be recovered; Defendant Mann minimizing the issue, describing the Google search disruption as "*considerably small*;" Defendant Zinman characterizing the impact as "*very, very low, almost insignificant*;" and Defendant Beber telling investors that the impact of paid-search headwinds was "*quite de minimis*." (Emphasis added).

13. Even as the deterioration persisted, Defendants assured the market that the problem had been ameliorated. On the Company's November 10, 2025 third-quarter earnings call, Defendant Zinman acknowledged that top-of-funnel trends had been "choppy," but assured

investors that "*towards the end of the quarter, we saw encouraging stabilization in new sign-up and top of funnel*," that the Company saw "*very healthy demand across all customer segments*," and that "*the pipeline remains healthy*." When analysts pressed on disruption to paid search specifically, Zinman doubled down: "*we saw stabilization… across Google AdWords*[3] *and across all other channels*," and "*the pipeline looks very healthy, it's growing according to our plans*." (Emphasis added). However, these statements belied the truth: the no-touch funnel had not stabilized, top-of-funnel activity continued to weaken, and the cost to acquire no-touch, self-serve customers continued to rise.

14. At the same time, to distract from the deterioration in paid search, Defendants announced, and repeatedly reaffirmed, a projection of $1.8 billion in revenue by fiscal year ("FY") 2027 that lacked any reasonable basis. At the September 17, 2025 Investor Day—held just five weeks after Defendants publicly dismissed the Google disruption as "temporary" and "almost insignificant"—Defendants announced a "base case" target of $1.8 billion in revenue by FY 2027. Defendants had no reasonable basis for this target, and its announcement misled the market regarding the Company's growth trajectory. It assumed the continued productivity of the no-touch acquisition engine that Defendants knew, from their own internal data, was structurally impaired, and Defendants disclosed nothing else to the contrary. It also depended heavily on both lackluster AI products and non-existing enterprise clients.

15. Nor did Defendants present the target as aspirational; by labeling it a "base case," they represented to investors that $1.8 billion was the outcome the Company expected even if conditions did not improve, and grounded the target in present conditions, confirming that this

[3] Google AdWords, now officially named Google Ads, is Google's "paid search" online advertising platform. As described above, for monday.com, this was the foundation of their no-touch channel.

number "*took into account the trends that we see today*." Defendants then repeatedly—and misleadingly—reaffirmed the target even as the no-touch channel on which it depended kept eroding. For example, on the November 10, 2025 Earnings Call, Defendant Mann declared that monday.com was "*firmly on track toward our Investor Day revenue target of $1.8 billion of FY27*." (Emphasis added).

16. As to both categories of misstatements, former employees ("FEs") describe a situation at monday.com that was vastly different from that portrayed by Defendants to the investing public. They detail how the erosion in the no-touch channel was in no way either temporary or trivial, but instead had continually been getting worse and threatened the core of monday.com's customer base. Then, they explain how the $1.8 billion target was built on revenue streams that each—for various reasons—had massive known flaws and how internal targets were routinely going unmet while the Company floundered.

17. Meanwhile, Defendants closely monitored the Company's acquisition channels, marketing spend, top-of-funnel metrics, and new product adoptions in real time through the Company's internal "BigBrain" analytics system, which measured performance marketing data, and Defendant Mann acknowledged that the paid search headwinds were "nothing we didn't see before." As alleged below, former employees confirm that the deterioration of the no-touch channel, the adverse traffic and conversion trends, and slowed growth were tracked and known internally throughout the Class Period.

18. The truth began to emerge on November 10, 2025—though even then, the disclosures were only partial. Although the Company beat analyst and investor revenue expectations for the third quarter of 2025, Defendants told investors to expect slower growth in the fourth quarter. That guidance partially revealed that the weakness in the no-touch channel was

not the short-lived, readily mitigated problem Defendants had described. In response, monday.com's shares fell 12.3%.

19. The full truth was revealed on February 9, 2026, when monday.com released its fourth-quarter and full-year 2025 results. At the accompanying earnings call, the Company rescinded the $1.8 billion FY2027 target entirely, with Defendant Glazer attributing the reversal to "*the evolving nature of the AI landscape and the choppiness in the no-touch demand environment*." (Emphasis added). The Company also issued fiscal 2026 revenue guidance of $1.452 billion to $1.462 billion—representing 18% to 19% year-over-year growth, a steep deceleration from the 27% growth the Company had achieved in FY2025, and well below consensus expectations. Defendant Glazer conceded that the guidance "*doesn't assume any rebound in performance marketing*[4] *or top-of-the-funnel*[5] *activity*," (emphasis added) and that the Company "*didn't see the improvement that we expected to see*" in the "*no touch business*."

20. In response to the February 9, 2026 disclosures, monday.com's ordinary shares stock price plunged approximately 21% from a February 6, 2026 close of $98.00 to close at $77.63, erasing over $1 billion in market capitalization in a single session.

## II. JURISDICTION AND VENUE

21. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

---

4 Performance marketing is a strategy where brands pay for advertisements only when a specific action is completed by a prospective customer such as a click, lead, or sale. Paid search and monday.com's no-touch channel fall under the umbrella of performance marketing.

5 As described above, monday.com's no-touch channel operated at the Company's top-of-funnel, meaning that it sat at the top of the Company's customer acquisition pipeline—i.e., new customers would be first exposed to monday.com through searching, clicking on the Company's website, and signing up.

22. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

24. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa(a)) and 28 U.S.C. §1391(b), as a significant portion of Defendant monday.com's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

25. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

### A. Plaintiff

26. Lead Plaintiff Steve Quinn purchased monday.com ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements alleged herein.

### B. Defendants

27. Defendant monday.com is an international corporation with its principal executive offices located at 6 Yitzhak Sadeh Street, Tel Aviv-Yafo, L3 677750, Israel. During the Class Period, the Company's ordinary shares traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "MNDY."

28. Defendant Roy Mann ("Mann") was, at all relevant times, the Co-Chief Executive Officer and Director of monday.com.

29. Defendant Eran Zinman ("Zinman") was, at all relevant times, the Co-Chief Executive Officer and Director of monday.com.

30. Defendant Eliran Glazer ("Glazer") was, at all relevant times, the Chief Financial Officer of monday.com.

31. Defendant Casey George ("George") was, at all relevant times, the Chief Revenue Officer of monday.com.

32. Defendant Harris Beber ("Beber") was, at all relevant times, the Chief Marketing Officer of monday.com.

33. Defendants Mann, Zinman, Glazer, George, and Beber are referred to herein together as the "Individual Defendants."

34. monday.com, together with the Individual Defendants, are referred to herein as the "Defendants."

35. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of monday.com's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, but not to the public, each Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the statements at issue were materially false, misleading, and/or incomplete when made. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published"

information, the result of the collective actions of the Individual Defendants. Each Individual Defendant is also liable as the maker of the statements they personally made, as identified by speaker and date herein, and monday.com is liable as the maker of the statements contained in its press releases, shareholder letters, and SEC filings. Each Individual Defendant had ultimate authority over the content and communication of the statements attributed to them.

36. monday.com is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

37. The scienter of the Individual Defendants, and other employees and agents of the Company is similarly imputed to monday.com under respondeat superior and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Overview of monday.com and Its Business Model

38. monday.com was founded in Tel Aviv, Israel, in 2012 by Defendants Mann and Zinman (together with Eran Kampf) as "dapulse." On June 10, 2021, monday.com commenced its initial public offering ("IPO"), issuing 3,700,000 ordinary shares to the investing public at $155.00 per share, raising gross proceeds of approximately $574 million at an implied valuation of approximately $6.8 billion. The Company's ordinary shares trade on the NASDAQ Global Select Market under the ticker symbol "MNDY." The Company is dual-headquartered in Tel Aviv and New York City.

39. Since monday.com is organized under the laws of the State of Israel, it reports to the SEC as a "foreign private issuer." Unlike a domestic issuer, monday.com files its annual report on Form 20-F and furnishes its quarterly financial results to the SEC under cover of Form 6-K.

Throughout the Class Period, monday.com was co-led by its two co-founders, Defendants Mann and Zinman, as Co-Chief Executive Officers.

40. monday.com sells a cloud-based software platform that the Company historically marketed as its "Work OS" (Work Operating System), a work management tool that enables non-technical users to assemble customized task trackers, visual dashboards, and customer-relationship managers, to help manage projects, workflows, and business processes. Built on that platform, the Company sells a suite of distinct products: (i) monday work management, the Company's flagship product and work-management offering; (ii) monday CRM, a customer-relationship-management product for sales teams; (iii) monday Dev, a product for software-development teams; and (iv) monday service, an IT- and service-management product.

41. Beginning in 2025, the Company overlaid its product suite with a set of AI offerings that Defendants placed at the center of the Company's growth narrative, including: "AI Blocks" (pre-packaged AI functions embedded in customer workflows); "monday Sidekick," an AI assistant; AI "agents" marketed as a "Digital Workforce" capable of completing tasks without human intervention; and "monday Vibe," an AI application building tool.

42. During the Class Period, the vast majority of monday.com's revenue consisted of subscription fees. The Company sells access to each product on tiered plans—generally "Basic," "Standard," "Pro," and "Enterprise"—priced per seat, per month, with discounts for annual billing and a minimum seat requirement on paid plans. Customers may subscribe on a monthly or annual basis, and self-serve customers can sign up, enter a credit card, and begin paying with no interaction with a salesperson. As a result, monday.com's revenue growth depends on a combination of (i) new customer additions, (ii) seat expansion and plan upgrades within existing customers, and (iii) specifically priced AI actions.

43. In May 2025, Defendant Casey George joined the Company as its Chief Revenue Officer. He immediately began insisting on a stronger growth tone and announcing impossible growth targets at numerous internal meetings. According to the Company's press release on April 3, 2025, George was hired to "lead the company's next phase of growth, specifically within the enterprise market, and oversee the CRO organization and revenue strategy." The press release also noted monday.com's stated goal to "grow headcount by 30 percent, with heavier investments to build out the sales teams" in 2025.

44. By the end of 2024, the Company claimed approximately 245,000 customers worldwide. Yet, as of February 2026, only 63,914 of those customers were "paid customers with more than 10 users," and only 4,281 had annual recurring revenue exceeding $50,000. As a result, small, self-serve customers—acquired primarily through no-touch channels—remained the foundation of the business.

**B. Customer Acquisition and the "No-Touch" Channel**

45. From its founding, monday.com's defining marketing strategy was to acquire customers primarily through performance marketing with heavy investment in online marketing and paid search. In its SEC filings, the Company describes its go-to-market strategy as an effort to "scale [its] self-serve funnel," where customers would learn about and sign up for the Company's services without any human interaction. In paid search, prospective customers would encounter monday.com through internet search results; click through to the Company's website; sign up for a free trial; and convert to paying subscribers often without ever speaking to a Company employee. Defendants and analysts referred to these performance marketing acquisition engines as their "no-touch" or "self-serve" channels.

46. The no-touch acquisition engine was expensive and heavily dependent on Google and other search engines to facilitate click-through traffic to monday.com's website. In its annual

reports, the Company disclosed advertising costs of $181.4 million in 2022, $203.2 million in 2023, and $218.4 million in 2024. As discussed below, FE-9—a former senior executive and head of CRM go-to-market at monday.com through April 2025—noted, "a lot of the marketing budget with monday in general was going to search term words."

47. The Company's annual reports confirm the no-touch channel's centrality, stating that monday.com's success depends on its "ability to attract customers through paid and unpaid internet search results on web search engines, such as Google," and that the "prominence of our website in response to internet searches" is "a critical factor in attracting potential customers to our products."

48. Defendants had extensive visibility into the no-touch channel's performance. monday.com repeatedly touted a proprietary, in-house analytics system called "BigBrain" that tracks the Company's operations in real time, including, per the Company's own Form 20-F, "media buying statistics tracking." As Defendant Zinman explained: "we have a big brain, and we monitor all the performance stuff . . . we monitor every campaign, every click, every expense." As discussed below, multiple former employees confirmed that BigBrain tracked marketing information, such as click-through traffic, sign-ups, and conversions. One employee explained how BigBrain data was a part of monday.com's "culture," with "screens plastered across the office" showing data from BigBrain dashboards.

49. The no-touch channel's dependence on search traffic made it acutely vulnerable to a structural change in how internet users perform searches and receive results. Starting in 2024, Google deployed and aggressively expanded "AI Overviews"—AI-generated summaries that answer a user's query directly on the top of the search results page—reducing the frequency with which users clicked through to third-party websites such as monday.com's. Throughout 2025,

users also began bypassing search engines and running more of their searches instead through AI chatbots and other large language model ("LLM") tools such as ChatGPT, which further disrupted monday.com's paid search traffic. As FE-9 (discussed below) pointed out,

> [N]ow more and more is coming from places like ChatGPT and other LLM tools. Now, people aren't putting in search for information on Asana. They're talking to ChatGPT and getting all kinds of results that it's crawling Reddit groups, and it's crawling forums, and it's like you can't buy that spot in Google for people who are getting their information from ChatGPT first.

The Company had built its business on converting search clicks into free trials and free trials into subscriptions, and the sustained erosion of its website traffic was not an insignificant problem; rather, it was a direct threat to the Company's customer-acquisition engine, its net-new customer growth, its net dollar retention, and, ultimately, the revenue trajectory Defendants promised the market. As alleged herein, that threat had already materialized by the start of the Class Period, and Defendants knew it.

### C. The Company Announces an Illusory $1.8 Billion Target

50. On September 17, 2025, at the Company's annual Analyst & Investor Day, Defendants announced for the first time a revenue target of $1.8 billion for FY 2027. Defendant Glazer introduced the figure as "the slide that you've all been waiting for," telling investors, "we believe, and we are confident that we are going to achieve $1.8 billion [] in fiscal year '27." Defendant Glazer grounded the number in the Company's existing business performance, citing "the multi-product that we have, the platform that we continue to invest with mondayDB, the fact that we are leveraging AI and capabilities into -- layered into our platform," and "[t]he fact that we are enhancing the enterprise customers' capabilities, which means bigger and larger customers will continue to buy monday." Defendant Glazer supported the target with other contemporaneous metrics that he stated provided "predictability and visibility into the numbers of monday."

51. Asked whether the market should treat $1.8 billion as a midpoint, floor, or high end, Defendant Glazer answered that "[y]ou should think about that as a base case." Defendant Mann added that "we look at it as a baseline." Defendants reaffirmed the target on the subsequent November 10, 2025 earnings call, where Defendant Mann stated that third quarter results put the Company "firmly on track toward our Investor Day revenue target of $1.8 billion of FY27." Less than three months later, on February 9, 2026, Defendants withdrew the target entirely.

**D. monday.com Goes "All In" on AI Products**

52. Beginning in 2025, monday.com introduced a series of new artificial intelligence features into its existing platform. On the August 11, 2025 earnings call, Defendant Mann announced monday magic, monday vibe, and monday sidekick, describing them as "three AI-powered capabilities that mark a major step forward in our evolution from work management to work execution." At the September 2025 Investor Day, monday.com announced a fourth AI product, monday agents, described as allowing customers to deploy AI agents that perform work autonomously.

53. Defendants presented these products not as experiments, but as an engine of monday.com's future growth. Defendant Zinman told investors at the Investor Day that "we want to go all in on AI," and that monday.com was "amplifying and changing our company North Star" from managing work to "actually doing the work for our customers" using AI. He reported "over 67 million AI actions on our platform," "45,000 actions in monday sidekick alone," "7,000 apps" built in monday vibe "in just two months," and "2,000 solutions" built with monday magic in "less than three months," concluding that "[o]ur customers are thirsty for AI usage, and the adoption is off the charts." Defendant Glazer identified continued investment in "platform and AI" as a "growth driver," and Defendant George told investors that "AI is foundational to all of this."

### E. In Reality, monday.com Faced Multiple Serious Issues

#### 1. Former Employees Confirm the True State of Affairs

54. Accounts provided by multiple former monday.com employees show that the Company's customer growth was deteriorating beyond the no-touch channel weakness, as the Company was experiencing a slowdown in expansion, customers were reducing product usage, the products were not up to par nor easily used, the Company was not gaining traction with enterprise customers, and management made up impossible targets "out of thin air" that nobody was meeting.

55. Together, the FEs' accounts establish that the Company's customer expansion was slowing materially in both the mid-market and enterprise segments before and throughout the Class Period, quotas linked to expansion efforts were going unmet across entire teams and segments, customers were reducing their usage of the products, the Company's AI offerings "didn't work" and were so poorly understood internally that the salespeople charged with selling them could not explain what they were, and there was no basis for the $1.8 billion target given to investors.

56. The FEs further confirm that monday.com tracked customer usage, renewals, and expansion on a daily basis through BigBrain and that deterioration in those metrics was escalated to management (to no avail). The accounts also illustrate that management committed the Company to enormous revenue targets without an explanation or a plan for reaching them, and that employees were being told internally that the Company was missing its targets at the same time the Company was issuing public statements that the Company was exceeding those targets.

57. FE-1 worked at the Company from May 2022 to March 2026 as an Enterprise Customer Success Manager, handling a book of 30 enterprise accounts. FE-1's responsibilities included ensuring customers found value in the product, optimizing the product for customers, troubleshooting, and renewals. FE-1 handled forecasting and "gathering customer sentiment"

about the product. As part of forecasting, FE-1 would advise sales personnel if a customer was likely to renew or expand three to six months out from their renewal date. FE-1 reported to Matt Ferrara, Team Manager, Enterprise Customer Success, who reported to Ruchita De, who reported to Cassie Vaughn, Regional Vice President, NAM & LATAM Customer Success.

58. FE-1 stated that they noticed a "significant" slowdown in expansion and actually saw a lot of customer[s] reducing their usage, especially during their last year at the Company from March 2025 to March 2026.

59. FE-1 stated that a lot of customers, and particularly enterprise customers, have access to other tools that have similar functionality as monday.com, and there was steep if not insurmountable competition for the Company's products that management failed to account for. As one market analyst wrote, "monday.com … has fierce competition in everything that it does. Its CRM products compete against the likes of Salesforce and HubSpot (HUBS), while its workflow and dev tools are up against Atlassian (TEAM) and ServiceNow."[6]

60. FE-1 stated that the customer success team was "always feeling like the communication being shared was that we weren't hitting targets." At the same time, according to FE-1, the team would see public headlines touting that the Company was exceeding targets – statements employees found "confusing."

61. FE-1 shared that renewals were tracked internally within monday.com and shared with the customer success leadership, and "likely" the sales leadership. FE-1 explained that BigBrain was used to track how customers were using products, including how many active users they had, user information and the activity by users across the account. According to FE-1,

---

[6] *Latest Tech Stock Analysis*, SEEKING ALPHA: STOCK IDEAS: TECHNOLOGY https://seekingalpha.com/article/4791418-mondaycom-exceptional-buy-as-new-products-and-upmarket-push-take-off-upgrade.

BigBrain would send an alert to the customer success manager if there was a significant drop in usage by an account.

62. FE-1 confirmed that executive management frequently shared the internal target of $10 billion ARR [annual recurring revenue] in the next five years at Company-wide meetings starting in 2024. FE-1 said that this goal did not seem reasonable to employees and that "the idea wasn't sold very well to us internally."

63. FE-2 was formerly employed by the Company as a Mid-Market Account Manager from June 2024 to November 2025. In FE-2's role, FE-2 worked with existing mid-market customers to expand business. FE-2's direct manager was Mike Lacerenza, Director—Account Management, Mid-Market, who reported up to Jamison Powell, Senior Vice President of Sales & GM North America. According to FE-2, when Powell left, Lacerenza reported to the CRO, Defendant Casey George.

64. FE-2's book of customers included about 80 companies with revenue goals of $80,000 per month, which FE-2 described as "really hard to hit" and "no one hit [their goals]" in FE-2's department of 30 people. In the last six months of 2025, FE-2 believes they hit their monthly target once. Otherwise, FE-2 was "maybe" hitting around $50,000 in revenue. "*We didn't have a ton of product to sell*," FE-2 explained.

65. On top of a lack of customer growth, FE-2 said that the products monday.com had to offer were "shitty" and "weren't super attractive" for new customers to buy. FE-2 described the AI products as "really confusing." FE-2 struggled to explain it, noting that FE-2 didn't even understand what they were. FE-2's colleagues were equally confused, even as the push to sell AI started around the spring of 2025. This made adding more seats the only real way to grow and rendered the $1.8 billion target even more unrealistic.

66. FE-2 noted that when FE-2 first joined the Company in 2024, customers were growing and adding licenses. According to FE-2, eventually, that stopped and they had to pivot in 2025. FE-2 believed "leadership knew" about the growth issues because they shifted the blame to the account managers, calling them lazy and saying that they were not working hard enough. "They knew that the business wasn't doing well," FE-2 said of Company executives. FE-2 stated that when the new CRO George joined in late 2025, the messaging was that account managers "aren't working hard enough" and that changes needed to be made. According to FE-2, however, there were never any changes made to the products being sold.

67. According to FE-2, FE-2's monthly quota was raised from $60,000 to $80,000. "We'd share all the time it was difficult and things weren't going well," FE-2 said of FE-2's team when they would meet and speak with Lacerenza. According to FE-2, Lacerenza would tell them he heard them and say he would bring it back to leadership, but nothing came of it.

68. FE-2 noted that in FE-2's last two months with the Company (October and November 2025), customer expansion was slowing and FE-2's manager was aware. "It kept going down," FE-2 said. By the time FE-2 left in November 2025, it was still "really difficult" to hit FE-2's targets. "Mid-market definitely didn't hit their segment targets," FE-2 said of the end of 2025.

69. FE-3 worked at the Company from April 2021 to June 2025. FE-3 was hired as an account executive and was then an account manager for FE-3's last two years at the Company. As an account manager, FE-3 managed 70 to 80 accounts of existing customers with 100 to 500 employees in the commercial segment. FE-3 first reported to Prasanna Budovsky, and then Mike Lacerenza.

70. According to FE-3, BigBrain tracked "everything," including usage, spend, account tier, and whether there were new users on the account. FE-3 added that BigBrain was connected

to Salesforce and that most of the data "lived" in Salesforce. According to FE-3, employees could access renewal information in both places. FE-3 shared that there were regular account status reports available on BigBrain that were updated daily. These reports weren't distributed but any employee could access them and employees at FE-3's level were "living in those dashboards daily." FE-3 shared that BigBrain would send account managers email alerts if an account was past its renewal date or if there was usage on an account that was not covered in the contract. FE-3 also shared that all credit card payments were processed through BigBrain.

71. FE-3 stated that executive management began stating in multiple all-hands meetings starting in August 2024, they had a goal to reach $10 billion ARR within five years. According to FE-3, executive management never explained why they felt the Company could hit that target, and sales employees were never given any kind of plan for how to reach that goal. FE-3 noted that the Company did not make any major product shift along with this target. FE-3 said that sales employees felt that target "did not seem reachable." FE-3 said that sales employees "constantly" asked middle management how they were going to hit the goal, and the response from management was simply, "you'll figure it out."

72. FE-3 shared that from summer 2024 through all of 2025, monday.com was still hiring sales employees and there were very high monthly and quarterly goals. FE-3 stated that there was "very little attainment" of those goals, and that when salespeople couldn't hit their targets, instead of layoffs, the Company put a lot of sales employees on performance improvement plans ("PIPs"), which FE-3 described as being a way of "laying off [employees] without actually laying [them] off."

73. FE-4 was formerly employed by the Company from September 2023 to March 2026, first as a Revenue Enablement Manager and then as a Senior Revenue Enablement Manager.

FE-4's responsibilities involved supporting Customer Success teams, who were responsible for helping customers with product adoption, ensuring renewal, and "spot[ting] expansion opportunities." For the majority of their time with the Company, FE-4 reported to Russell Kiely, Revenue Enablement Team Lead, NAM + LATAM, who reported to David Seugling, Director of Revenue Enablement. Seugling reported to the head of Revenue Operations, who reported to Casey George.

74. FE-4 stated that they were "sure" BigBrain tracked click-through traffic, sign-ups, and conversions, and that BigBrain was updated "at least once a day." FE-4 further explained, "We had data from Salesforce, but even that all fed into BigBrain. Everything went into BigBrain." FE-4 stated that "anyone in the company" had access to BigBrain, and that onday.com's senior leadership "definitely" had access to it because it was the Company's "main data source." FE-4 further stated that they had access to "every report housed in the platform," and that "I don't think there were restrictions on what you could find."

75. FE-5 worked for the Company from May 2024 to June 2026 as a Senior IT Services Team Lead—Americas. FE-5 led a team that provided in-house IT services, help-desk support, AV-room management, and technology tools. FE-5's work focused on backend technical support rather than customer-facing IT systems. FE-5 reported to Levi Hadas, IT Services Global Group Lead, who reported to Lior Segury, Senior Director of IT Services.

76. FE-5 recalled that there was an effort to move away from SMBs, and that from mid-2025 through early 2026, the Company pursued enterprise customers as its long-term strategic focus. *FE-5 was aware that enterprise contracts were stalling, customers were dissatisfied with services,* and teams were increasingly directed toward AI-agent solutions.

77. FE-5 remembered the CEOs referencing a $10 billion revenue target over a five-year horizon. Every employee FE-5 spoke with questioned that revenue target and considered it unattainable based on standard internal metrics. *The internal sentiment was that the number had been "pulled out of thin air."*

78. FE-6 worked at the Company from March 2023 to June 2026. FE-6 started as a Sales Strategy and Operations Analyst and was promoted to a Sales Strategy and Operations Manager. FE-6 was responsible for "data and reporting," as well as forecasting and coming up with strategies to increase revenue. FE-6 reported to RevOps Team Lead Mari Miyamoto, who reported to Regional Director, Revenue Operations Gal Omer. Omer reported to Director of Revenue Operations Aviv Caspi, who reported to Senior Director of Strategy and Operations Oran Akron and later to VP, Revenue Operations Ari Klionsky. All of the aforementioned people worked under the Chief Revenue Officer.

79. FE-6 described BigBrain as an "internal platform to house customer data" as well as financial data. FE-6 stated that the Company tracked marketing data such as click-through traffic through a platform called HubSpot, which then fed into BigBrain. FE-6 explained, "There was definitely data for our sales reps or our marketing to understand if the campaigns were working and which customers had clicked through certain things and certain content."

80. FE-6 stated that they used information from BigBrain in preparation for an investor presentation. "BigBrain would have been the source of truth for all of that."

81. FE-6 stated that the platform updated "probably even more" than daily, and that "anyone in the company" had access to BigBrain and its data. The Company had "screens plastered across the office" showing data from BigBrain dashboards, which was part of the

Company's "culture." FE-6 stated, "You could easily see, if anyone walked into the office, a lot of our financial information that would be on BigBrain."

82. FE-6 stated that throughout 2025, "there was a big concern with the Enterprise readiness" as well as "retention." When "bad metrics came out" for Enterprise, there was usually a response of, "*Hey, we don't have a good enough product to sell to a lot of these customers*." FE-6 explained that it was "mostly just the product couldn't serve bigger organizations. It was good for SMB and Mid-Market, but once it got to bigger orgs and dealt with different hierarchies and complexities, it was hard to sell." FE-6 explained that, for enterprise customers, "you would need a lot of integrations. And a lot of big organizations have security parameters and stuff. And a lot of the tasks in Monday are very manual. The core functionality would be hard to scale with 10,000-20,000 employees or more." FE-6 noted that this fact was well-known throughout the company, and that the difficulty selling to Enterprise customers "was something the Sales team would always talk about in meetings as to why they missed their plan."

83. FE-6 also stated that in 2025, BigBrain was recognizing "tens of millions" of dollars in payments or customer spending that monday.com was not, in fact, receiving. That's because the company was erroneously counting a significant number of "SMB" and "Mid-Market" customers as paying customers because of a technical issue with account permissions that allowed customers to keep using the platform after their subscriptions ended and they had stopped paying. FE-6 explained, that "[m]aybe at one point they were paying, but it was turned off or their subscription – they stopped paying for whatever reason. And we didn't turn off their subscription." FE-6 said the problem was apparent if you compared customer subscription records to financial information showing the "actual money coming in." FE-6 stated that this discrepancy created "a lot of data issues," but that "data accuracy" was "not a concern" at the Company.

84. FE-6 stated that this discrepancy was discussed frequently in strategic meetings and that "all my senior leadership knew about it on the Strategy and Operations side." FE-6 stated that the CRO at the time, Jamison Powell—who reported to Yoni Osherov, who then reported to CEOs Roy Mann or Eran Zinman—knew about this issue because Powell attended meetings with FE-6 where the issue was discussed. FE-6 stated, "Jamison was definitely aware that we had a big subset of customers that were using the product and not paying for it."

85. FE-6 stated that, after Powell left the Company, the meetings were attended by Regional Vice President Jason Miller, Regional Vice President Yoav Shetrit and a Regional Vice President named Lindsay whose last name FE-6 did not provide. FE-6 added that it took monday.com about six months to hire a "new U.S. person" (to replace Powell), which was VP of Sales, North America Lauren Sandtorv. According to FE-6, prior to Sandtorv's hiring, the meetings mentioned above were led by Miller and Shetrit, Webster said, adding that Miller and Shetrit started to lead these meetings as soon as Powell left the Company.

86. FE-6 stated that discussions about getting money from non-paying customers that were still using monday.com came as the Company "started to struggle to hit plan at the end of 2024 going into 2025." "Targets were higher than the output," FE-6 said about the Company failing to hit its plan. FE-6 added that "[e]veryone was aware of it. It was pretty well-known. So Jamison, all the sales managers, all the data teams, my team were involved in trying to fix that." Asked if monday.com was always behind plan throughout FE-6's tenure, they said, "[y]eah, for the most part."

87. FE-7 worked for the Company from December 2025 to January 2026 as a Technical Customer Success Manager. The Technical Customer Success Team was created in Q2 or Q3

2025 to stem customer losses. FE-7 was responsible for working with customers who were labeled at-risk of dropping the service.

88. FE-7 reported to Courtney Loonie, Team Manager of Tech Touch Customer Success. Loonie reported to Kim Landau, Regional Vice President of Tech Touch Customer Success, who reported to Chief Customer Officer and COO Adi Dar. Dar reported to the CEO.

89. FE-7 recalled attending an on-site meeting, hosted by Chief Customer Officer and COO Adi Dar, in December 2025. Again, Dar reported directly to the CEO. In that meeting, Dar told between 70 to 100 customer managers that *revenue being generated by the sales team was being offset by customer losses*. Dar told the managers that the Company "started looking at our profit from a loss perspective and not from a net growth positive perspective."

90. FE-8 worked for the Company as a Growth Partner Manager from November 2024 to February 2026. FE-8 worked with a network of 2,000 "referral partners," which were "technology firms that would implement" monday.com's platform "for customers on behalf of monday.com."

91. FE-8 stated that "there was definitely doubt" internally about the $1.8 billion revenue target, with people thinking it was "an arbitrary number."

92. FE-8 stated that "it was very obvious when [the Company] pivoted their whole strategy to AI." FE-8 said they "constantly got questions" from the referral partners FE-8 worked with about the Company's AI features. The referral partners said things like, "This thing doesn't work. What is the goal of this? It doesn't make sense." FE-8 commented, "They launched a lot of things without them working." FE-8 recalled their referral partners having particular problems with the Company's "Vibe" AI tool. "I have no idea what that was to be honest with you," FE-8 said. "Vibe didn't work."

93. Even so, in 2025, monday.com was ramping up its headcount while its existing employees were idle and unable to meet their targets. As one market analyst highlighted, "one area of concern is monday.com's continued buildup in headcount to support its growth. It ended Q1 with 2,695 total employees, up 36% y/y."[7]

94. In sum, the former employees' accounts demonstrate that despite the Company's public statements, it was facing deterioration in customer usage, renewals, and expansion, there was no basis for its revenue targets, and this was well known by management.

### 2. AlphaSense Interview with Former High-Level Employee at monday.com

95. FE-9 held a high-level position as the head of monday.com's CRM go-to-market strategy for North America until April 2025. FE-9 gave an interview with AlphaSense on January 16, 2026 that was published on January 30, 2026.[8] FE-9 was part of the senior leadership team at monday.com and previously spent 11 years as a product go-to-market head at Salesforce.

96. Plaintiff's counsel subsequently interviewed FE-9. FE-9 confirmed that they were the individual who provided the January 2026 AlphaSense interview. FE-9 confirmed to Plaintiff's counsel the passages from the AlphaSense interview quoted below.

97. FE-9 also confirmed they worked for monday.com as the Head of GTM for CRM, North America from September 2024 to April 2025. In FE-9's role, FE-9 was responsible for the CRM product's go-to-market product roadmap in North America. FE-9 reported to Jamison Powell who hired them, and then reported to COO Adi Dar upon Powell's departure and replacement by CRO Casey George. FE-9 noted that they worked "a lot" with U.S. sales leaders, product management, and product marketing. FE-9 also met weekly with the Head of Marketing

---

7 SEEKING ALPHA, *supra* note 6.

8 AlphaSense is a market-intelligence platform that provides access to research and various other types of market-relevant information and publishes interviews with industry professionals familiar with a given company.

Emmanuel Cohen. Regarding COO Dar, FE-9 stated, "Adi Dar is a bean counter," and "I don't think there's a nickel anywhere in that Company that Adi didn't know where it came from."

98. In the AlphaSense interview, FE-9 explained that the Company's search-driven top of funnel had been deteriorating very rapidly, and that the deterioration was caused by a permanent shift in how users started searching online:

> That was deteriorating very rapidly on search words though, because a lot of the marketing budget with monday in general was going to search term words. People go into Google and search for maybe it's work management, maybe they're searching for Asana and Smartsheet, but monday's paying big dollars to Google to move to the top of the search results and usurp that spot from Asana. You're searching for Asana, and the first thing that comes back in your search results is monday.
>
> What's going on is now more and more is coming from places like ChatGPT and other LLM tools. Now, people aren't putting in search for information on Asana. They're talking to ChatGPT and getting all kinds of results that it's crawling Reddit groups, and it's crawling forums, and it's like you can't buy that spot in Google for people who are getting their information from ChatGPT first.
>
> *The yield on all those dollars going to Google was just plummeting. The cost of a marketing-qualified lead*[9] *was going up. I don't think that's a unique problem to monday, but their cost to that top of the funnel has really been impacted by the overall behavioral change that people are doing their research more and more in ChatGPT and less in Google Search words.*

(Emphasis added.)

99. When the AlphaSense interviewer observed that monday.com had called the search-traffic disruption issue out but tried to de-emphasize it by stating that only 10% of their net new ARR was generated by Google and asked whether that characterization lined up with FE-9's experience. FE-9 rejected the framing:

> *No matter what you call it, the cost of a marketing qualified lead going over $500, and your average deal size, there's a lot going on there with the cost of sale and customer acquisition. Those are not good underlying, healthy foundations.*

---

9 Another way of describing customer acquisition cost.

> *If I'm investing in a SaaS company, I want to know what the break-even is between their costs of customer acquisition and sales and marketing cost*, and like, "When is this company going to break-even on this customer? Did they have to keep a subscription for three years just to be break-even?" There's a lot of things that monday does efficiently, but *the call-out there is that the customer acquisition cost from that kind of PLG[10] top-of-funnel marketing was going up rapidly during my time there*. That's what I wanted to share with you.

(Emphasis added.)

100. In speaking with Plaintiff's counsel, FE-9 described a deterioration in the Google paid search channel that was *ongoing from when they started in September 2024, and worsening until they left the Company in April 2025*. FE-9 noted that the market was pivoting "very rapidly" towards generative AI, leading customers to skip Google and ask ChatGPT. According to FE-9, for monday.com, this meant that the Company was not getting the performance out of the paid Google search terms. FE-9 noted that this was not "a secret or unknown reality" for monday.com's product marketing team during their tenure; it was "very visible" and "on the front page" of their job every day—which involved customer acquisition costs ("CAC"). According to FE-9, CAC was rising "every single month over month over month." FE-9 stated that this rise in CAC was directly due to "the performance of Google search deteriorating." During FE-9's tenure, monday.com was not shifting to a generative or answer engine strategy, which they described as a "big headwind on growth."

101. According to FE-9, it became "harder and harder to find that next customer through that traditional product-led growth method" which involved seeing an ad, clicking on it, doing a free trial, and converting to paid. FE-9 knew that this issue was discussed "in every single

---

10 "PLG" stands for product-led growth, a business strategy where the product itself serves as the main driver of customer acquisition, retention, and expansion. Key components often include self-serve models (like monday.com's), user-driven growth (like monday.com's multi-product or "land and expand" model), and easy online onboarding processes (like monday.com's no-touch channel). It stands in contrast to sales-led growth ("SLG"), which relies on human sales teams, pitches to clients, and negotiated contracts.

marketing meeting" and spoke with Head of Marketing Emmanuel Cohen about it. FE-9 noted that it was a "root cause issue that was very well known" and that "given the amount that Monday spends at the time I was there on online marketing and branding, it was a huge problem for everyone to tackle together." FE-9 called it a "known issue" from FE-9's first day at the Company *that continued to worsen every month until FE-9's departure in April 2025*. Indeed, FE-9 said that rising CAC was "a known fact… throughout the Company."

102. FE-9 explained that one could view trendlines including sales growth and CAC on BigBrain. FE-9 noted that in BigBrain, they could see click-through rates and noted the ability to get the conversion from the same amount of spend with Google and those SEO terms was generating less. FE-9 stated that it doesn't mean the volume is going down, it just means "they keep spending more and getting less ROI per dollar."

103. In the AlphaSense interview, FE-9 further explained that monday.com's concentration in the SMB segment—which was primarily driven by monday.com's no-touch channel—carried a fundamental retention problem that the Company had to outrun:

> Given where a lot of their install base is, one of the big downsides of being an SMB-focused SaaS provider is you deal with very, very high levels of churn in your customer base. For example, when I was head of adoption at Salesforce, we ran a ten figure business on the assumption of 7% churn, 93% retention every year. If we just looked at SMB, that churn rate was 30% just from SMB. Those companies are small. They go out of business, they get acquired.
>
> *The problem for monday is in that SMB sweet spot, they have a lot of churn, they have a lot of non-renewals, and it's also hard to keep filling more and more water into that top of the bucket when you have a bigger hole leaking the water out on the bottom of the bucket because there's a lot of churn to outrun.*

(Emphasis added.)

104. Speaking with Plaintiff's counsel, FE-9 added that SMB churn was "very, very high," noting that small businesses go out of business or get acquired. FE-9 explained that SMB

churn was high, getting bigger and bigger as the Company's baseline grew, *and compared this churn to trying to run up an escalator that is going down and it keeps going faster and faster.* FE-9 explained, "[i]f you want to keep 20% to 30% growth, have to spend a lot to keep finding more and more business that way."

105. During the AlphaSense interview, FE-9 also expressed skepticism about monday.com's ability to make headway in the enterprise market:

> *In no way, shape, or form is it a Salesforce for an enterprise company like Amazon with 50 orgs and global businesses, and just the complexity of hierarchies, and business units, and splits among teams. monday doesn't do any of that.*
>
> . . .
>
> It's like I'm looking at a spreadsheet that tells me where the work is, but the core work behind it is not moving through a system like monday. That's what companies like SAP and ServiceNow build big, big backbones on AWS and Azure, and they're managing massive data warehouses and intelligence, *and Monday's not any node on that enterprise architecture. It's a tool.*
>
> . . .
>
> It's like every company I've worked for that has a bundle of Jira licenses, Microsoft Office licenses, Google Gemini licenses. It's just in your company's toolbox in a lot of these enterprise companies that they have a bunch of them. *If you want to request one, you request one, but there's no top-down governance that says we live in monday here. I only see that at team or department levels.*
>
> . . .
>
> *What I found was they haven't really pivoted to that command of the message or top-down work because a lot of the things that were still going on when I was there was, it still behaved very much like a company that sells to the lead rather than the account in enterprise.*

(Emphasis added.)

106. Indeed, when asked by the AlphaSense interviewer *whether FE-9 thought monday.com could achieve a shift from SMB to enterprise within the next two years, FE-9 answered, "No."*

107. Speaking with Plaintiff's counsel, FE-9 explained it was their belief that CEO Eran Zinman's vision was to have monday.com's platform be a single source where all work resides for an enterprise organization. In FE-9's experience, this is not how enterprise customers used monday.com. Rather, according to FE-9, the adoption method for enterprise companies is that it is procured by a customer's IT department as a tool for project managers in different departments or projects to use rather than company-wide. FE-9 thought this vision to have Monday be a "single source of truth" was "aspirational" rather than a "reality," as products are more geared towards self-service or specific projects.

108. During the AlphaSense interview, FE-9 also noted that monday.com had hitched a lot of its growth plan to the adoption of AI, and described the monetization mechanism and its limits:

> It's not saying they don't have a growth plan, but I think what I would want you to hear from me is they have hitched a lot of that to adoption of AI in the form of features that they are including like monday Magic, and monday Vibe and Agent Marketplace. Why are they doing that? They're doing the same freemium or starter packs that everybody is doing.
>
> The push there is they want to help you drive your adoption like forward deploying help to you to say, "Oh, look at all this cool AI stuff we can be doing, generating our emails for us, and reading our support tickets for us, and all this stuff is great, but that's burning tokens." They can come back to you and say, "Wow, you're really using a lot of AI capability. Now, you need to buy a bundle of another $50,000 on your license to pay for all the AI tokens."
>
> *That's what everybody doing is they're giving you the freemium access to a bunch of AI capability, and then encourage you to use it because you're burning consumption credits, and then you have to buy more. Yeah, they get a little bit of uplift on you need more APIs, you need more, automations to fire every month. That's not a big money maker for them, and I think they're banking on AI being the silver bullet for upsell because it's not just your sale for your user information.*

*(Emphasis added.)*

109. Speaking with Plaintiff's counsel, FE-9 added that it was "mission critical" to get more ARR from customers because they were starting to tap out more and more on seat licenses they could add on a monthly basis. FE-9 explained that a lot of the AI features for monday.com were either metered or behind a paywall. However, according to FE-9, it was not a big money-maker for the Company because it was still quite in the early phases at the time FE-9 was there. FE-9 noted that in January 2026, when they gave the AlphaSense interview, these "freemium" deals were "generating a lot of shelfware," meaning that the Company was giving AI features to people in hopes they would turn it on and see how great it was, but people were not turning it on, leading it to "just sit there." FE-9 explained that it takes a lot of education and engineers to build out these AI agents, so while Monday and other companies were giving out these features, they were not doing "a whole lot" to get people to consume the AI tokens. According to FE-9, because most of the Company's customers are SMBs, they do not have the types of resources on staff like a data scientist or AI engineer to work on it. FE-9 explained that this is one of the barriers to small businesses because there is a lot of work to design and create AI agents, integrate and connect it with different products, and test it. FE-9 noted that SMBs did not need to pay monday.com for that, they could just use existing AI like Google Gemini.

### F. Defendants Made Numerous Material Misstatements and Omissions During the Class Period

110. Throughout the Class Period, in earnings calls and investor conferences, Defendants made materially false and misleading statements and omitted material facts from the public in two primary ways: (a) Defendants minimized the deterioration of monday.com's no-touch, self-serve customer acquisition channel; and (b) Defendants announced and repeatedly reaffirmed an illusory and unrealistic revenue target of $1.8 billion for FY 2027.

### 1. Defendants Minimized the Deterioration of the Company's No-Touch Channel

#### a. August 11, 2025 Earnings Call

111. For additional context, leading up to the start of the Class Period, Defendants had not previously disclosed any softness in their customer acquisition channels during the first quarter of FY 2025. To the contrary, on the Company's May 12, 2025 earnings call, when asked directly about how AI-driven changes to search channels would impact the Company's top-of-funnel, Defendant Zinman responded that "the demand is very healthy," and "we're able to continue and invest in growth in a very good way," going as far as to attribute the Company's strong first quarter 2025 customer additions to "stronger performance marketing that we're able to span efficiently." As such, when Defendants eventually dismissed no-touch channel weakness as temporary and minor in August 2025, investors had no reason to doubt Defendants' representations and were inevitably misled.

112. On August 11, 2025, monday.com published its second-quarter FY 2025 results and conducted an earnings call. On the call, analysts questioned Defendants about softness in the Company's no-touch business associated with changes to Google's search engine. Though Defendants acknowledged weakness in this channel, they repeatedly mischaracterized its magnitude, duration, and reparability.

113. When asked directly about remediating the impact from AI-generated search responses on paid-search and customer acquisition costs, Defendant Mann minimized the impact, stating:

> *[I]t's not something we didn't see before. It's now -- it's not a huge impact that we see on performance marketing*. And we have a lot of room to grow in other areas, and we can optimize for that. And so we're also doing a lot of AIO in AI, and what's being searched by people in AI, and that they find us there. But generally, it's *not such a big impact right now when we can mitigate it in many different ways*.

(Emphasis added).

114. Later on the call, Defendant Mann reiterated further that:

- . . . and like I said before, *it's not such a significant impact until now, not -- nothing we didn't see before. So it's just a matter of budget allocation and scaling on areas that we improve on.*
- *So it's something we can improve and iterate quickly. So yes, it's not that big.*
- . . . the better high-quality customers still click on Google and add. *If you're looking for a solution such as a CRM or project management, you're going to reach us, okay? So the drop that we see is just on volume because they are experimenting with AI on top. And it's not that significant for the higher quality of customers. So it's more volume than quality. And we can get that from many other areas. So again, like I don't, I think we can mitigate that relatively quickly.*

(Emphasis added.)

115. Defendant Zinman went further, assuring that the impact was immaterial, stating:

> As I mentioned, the enterprise part of the business is performing well according to our expectations, summarized in the first half of the year. We saw some weakness in the lower side of the business. Part of it is because of the Google changes. Part of it is maybe some other trends that it's kind of hard to understand kind of what exactly they're coming from, but we see a little bit of weakness regardless of the Google search.
>
> And look, we try to be as transparent as possible about the index we see from the search engine. *It's just not that material right now, but it's a start of a trend . . .*
>
> Currently, in terms of, I don't -- we don't have the exact percentages, but it's *very, very low, almost insignificant*, but it has some effect in our ability to acquire some part of the lower end of our customer base.

(Emphasis added.)

116. Defendants' statements in ¶¶113-15 were materially false and misleading when made. Defendant Mann's and Zinman's characterizations of the impact as "not that big," and "almost insignificant," misrepresented a decline that was already well advanced and still worsening. Defendants knew, when they made these statements, that the decline reflected a lasting

change in how prospective customers used search engines, away from paid search and toward AI-generated answers, and increasingly away from search engines altogether as users progressively began running searches on AI chatbots.

117. Indeed, FE-9, who ran the Company's CRM go-to-market strategy for North America until April 2025, stated that even during their tenure, the Company's paid search-driven top of funnel had been "deteriorating very rapidly," that "[t]he yield on all those dollars going to Google was just plummeting," and that "the customer acquisition cost from that kind of PLG [product-led-growth] top-of-funnel marketing was going up rapidly during my time there." FE-9 further noted that the Company's "cost to that top of the funnel has really been impacted by the overall behavioral change that people are doing their research more and more in ChatGPT and less in Google Search words." In addition, according to FE-9, CAC was rising "every single month over month over month." FE-9 noted that this rise in CAC was due to "the performance of Google search deteriorating." These were not temporary shifts, but permanent changes that threatened persistent disruption in the Company's no-touch channel.

118. The deterioration FE-9 described did not abate after they left. For example, an analyst reported, based on data from a leading commercial web-analytics service, that monday.com's SEO-driven traffic fell 23.5% year-over-year in the second quarter of 2025, with the decline worsening to over 25% in July. When Defendants told investors on August 11, 2025, that the impact was "very low, almost insignificant" and "not that big," unpaid search traffic to monday.com's website had already fallen by roughly a quarter year-over-year, and the decline was accelerating. Neither the size of this decline nor its acceleration was disclosed on the call. Defendants, who "monitor every campaign, every click, every expense," had the Company's own data on the same channel.

119. Further, Defendants misled investors about the impact of changes to search on the Company's business by saying it only affected the "lower side of the business" or smaller SMB accounts. However, Defendants knew that such SMB accounts had been, and remained, foundational to the Company's growth. Indeed, Defendant George conceded as much a month later during the September 17, 2025 Investor Day when he affirmed that success in SMB was crucial to the overall enterprise and upmarket growth, stating "because we dominate SMB, we don't want to leapfrog over mid-market. This is where our portfolio resonates pervasively across that segment. So, we're going to double down as we move upmarket, aggressively going into cross-selling in SMB and mid-market, and let the market come to us in enterprise, because that's what it's doing today, there's this gravitational pull."

120. The disruption affected the entire, crucial SMB segment, despite what Defendants said. FE-9 noted the churn and non-renewals in that segment and compared it to trying to run up an escalator that is going down and it keeps going faster and faster. FE-9 explained, "[i]f you want to keep 20% to 30% growth, [you] have to spend a lot to keep finding more and more business that way." A sustained deterioration in the channel that supplied those customers was therefore material to the Company as a whole, and not simply, as Defendants characterized it, merely confined to its smallest accounts.

121. Although monday.com's stock price declined on August 11, 2025, this decline did not reflect the full truth, as Defendants simultaneously assured investors that the no-touch channel softness was "temporary," readily mitigated, and would be "recovered going into the second half of the year." These false assurances prevented the market from appreciating the structural and persistent nature of the channel deterioration or rising customer acquisition costs, and maintained artificially inflated stock prices.

122. Analysts reacted positively, echoing Defendants' characterization of the weakness as temporary:

- Canaccord Genuity: "management expressed confidence that they can circumvent these issue with strategic reallocation of marketing resources . . . we likewise think it's going to be a temporary headwind, as marketing strategies will adapt, content will be optimized for answer engines, and spend will be aimed at the most efficient channels."

- J.P. Morgan: "The company observes 'some softness' within the down-market segment, partially due to the Google algorithm changes with the introduction of AI Overview technology, which can limit traffic back to a website such as Monday.com, but believes this is temporary, while Monday continues to report enterprise momentum."

- Oppenheimer: "low-touch/SMB customers showed some weakness, and CRM/Dev net adds moderated somewhat . . . [but] [g]iven management's track-record/execution, we're comfortable the needed adjustments will be made, especially considering monday.com's growing enterprise/up-market focus (CRO/CMO, continued sales hiring, product/packaging) and cross-sell opportunities (CRM/Dev/Service/AI-capabilities)."

- William Blair: "Management indicated that this is a minor and temporary dynamic that can easily be remedied in the coming months through budget reallocation to other scaled channels"; and "Management believes the headwinds are a minor and temporary issue that it can remedy in the coming months through reallocation of performance marketing spend to other scaled channels . . . as Monday increasingly moves upmarket, we believe the search headwind on SMB should not have a big impact on the company's performance."

- Wolfe Research: "MNDY attributed these headwinds to updates GOOGL made in the algorithm in the quarter, as well as some changing search trends . . . Management remains confident in strong RPO (internally tracked), supporting their conservative outlook. We believe the current share downdraft dramatically over-estimates the actual business impact"; and "[t]he team stressed their ability to react quickly to changing dynamics, characterizing recent noise on SEO as a temporary disruption from strategic repositioning."

**b. September 17, 2025 Annual Investor Day**

123. On September 17, 2025, at the Company's annual Analyst & Investor Day, monday.com's Chief Marketing Officer, Defendant Beber, directly addressed the impact of AI-

driven changes to paid search on the Company's no-touch channel, dismissing it as trivial and stating:

> . . . the emphasis on them, I think, has been outsized, relative to the impact on our actual business, which is *quite de minimis . . . Google represents about 10% of new. But when we look at the category, overall, the category has seen about a 16% decline in clicks, where we've only seen a 9% decline in clicks*. Why? Because we're really good at growth marketing. So, *we've actually been gaining share as it contracts . . . .*

(Emphasis added.)

124. Defendant Beber's statements in ¶123 were false and misleading for the reasons stated above in ¶¶113-15 and for the following additional reasons. His representation that the impact on monday.com's "actual business" was "quite de minimis," and that the Company had "actually been gaining share as it contracts," misrepresented the persistent and structural deterioration in the no-touch channel that had a material impact on the Company's growth trajectory.

125. Further, Defendant Beber's comparison of monday.com's decline in clicks to overall product category decline in clicks omitted the Company's outsized reliance on no-touch performance marketing relative to its peers, resulting in a far greater impact on monday.com's business than to others. FE-9 confirmed that "a lot of the marketing budget with monday.com in general was going to search term words." FE-9 also rejected the minimization of Google paid search as only driving 10% of the Company's ARR, stating that "[n]o matter what you call it, the cost of a marketing qualified lead going over $500, and your average deal size, there's a lot going on there with the cost of sale and customer acquisition," and that "[t]hose are not good underlying, healthy foundations."

126. FE-9 also noted that the Company's claim that Google paid search accounting for only 10% of net new ARR did not seem congruent with the churn the Company was experiencing

in SMB and the disruption in the paid search channel. FE-9 confirmed that although there was not necessarily a drop in click-through traffic, there was a decline in the efficiency and cost per marketing qualified lead. According to FE-9, it doesn't mean the volume is going down, it just means "they keep spending more and getting less ROI per dollar."

127. Moreover, even as Defendant Beber dismissed the impact of the no-touch channel weakness, he simultaneously confirmed that the Company was shifting its marketing investment to sales-led growth, video, and social media. If the no-touch channel erosion was temporary and immaterial, there would be no reason to drastically shift their marketing strategy in this way.

128. Analysts again reacted positively to Defendants' misstatements, and echoed Defendants' minimization:

- DA Davidson: "With regards to, the impact of Google Search changes, monday.com indicated it has performed better than industry peers which saw a 16% decline in click rates compared to a 9% decline for monday.com. Management again highlighted it can reallocate spend away from Google Search."

- Wolfe Research: "Management reiterated that SEO concerns have been de minimis to the business, with Google search contributing only ~10% of new ARR. While the broader category has seen a 16% decline in clicks, monday's decline was just ~9%, and management suggested investor focus on SEO has been outsized relative to its actual business impact."

- Canaccord Genuity: "management provided reassuring context: Google Search currently accounts for only ~10% of Monday's new ARR, and while search clicks are down ~16% industry-wide, Monday's traffic has fallen just ~9%, highlighting relative resilience… Bottom line, while changes in discoverability are real, we believe Monday can adapt."

- TD Cowen: "Mgmt highlighted it is alleviating top of funnel pressures from search via its other 55 customer acquisition channels, notably AI search engines and video channels."

- William Blair: "With all the noise around search headwinds, Monday clarified that search only accounts for about 10% of its new ARR… As Monday focuses more on cross-sell, expansion, and upmarket traction, we expect search to become even less relevant. We were also encouraged to hear that Monday is not losing share in search as the category has seen a 16% decline in click rates, while Monday has only seen a 9% decline… We came away from the investor day more encouraged on

> Monday's long-term positioning, and believe the near-term challenges are largely temporary and not competitive or structural."

**c. November 10, 2025 Earnings Call**

129. On November 10, 2025, Defendants published their third quarter fiscal 2025 results. On the corresponding earnings call, Defendant Glazer represented that the pressure on the Company's top-of-funnel had stabilized by the end of the quarter, stating, "[W]e have signs of stabilization in top of funnel at the end of the quarter that we are encouraged by that going into the fourth quarter and into next year."

130. Defendants' statements in ¶129 were false and misleading for the reasons stated above in ¶¶113-15 and ¶123 and for the following additional reasons. Defendants went beyond minimizing the no-touch channel weakness, representing instead that it had abated. Defendant Glazer assured that the Company saw "signs of stabilization in top of funnel," which is where the no-touch channel operated. In truth, the channel had not stabilized due to the permanent underlying shift in search user behavior toward AI-generated answers in search engines and toward tools such as ChatGPT. Three months later, Defendants admitted that the deterioration "just continues," that the Company "didn't see the improvement that we expected to see," and that they expected the environment to remain "choppy" through 2026 with no "rebound in performance marketing or top-of-funnel activity."

131. These later admissions confirm what was already true when Defendants claimed stabilization. The shift in search behavior eroding the no-touch channel was neither new nor reversing. As discussed above, FE-9 described a deterioration in the Google paid search channel that was ongoing from when they started in September 2024, worsening until they left the Company in April 2025. FE-9 stated that it was a "known issue" from their first day at the Company and continued to worsen every month until their departure in April 2025. According to

FE-9, CAC was rising "every single month over month over month," due to "the performance of Google search deteriorating." During their tenure, monday.com was not shifting to a generative or answer engine strategy, which they described as a "big headwind on growth." Defendants identified no change in that underlying dynamic that could have caused the channel to stabilize. To the contrary, Defendant Mann later acknowledged that what the Company saw in performance marketing was "the same things we called out before," that it "just continues," and that "the cost to acquire and expand self-serve customers have increased over the past year, and the returns on those investments have been below historical levels." As such, Defendants were at a minimum deliberately reckless in representing that the softness had stabilized when their contemporaneous internal data showed otherwise.

132. Despite lowered guidance, analysts again reacted positively and accepted Defendants' stabilization narrative:

- Cantor: "Towards the end of the quarter though, management saw positive stabilization in new sign-ups and top-of-funnel, with positive signals around pipeline health."
- Piper Sandler: "The SMB motion was impacted by 'choppiness' with Google Ad words during the quarter that has since stabilized."
- Wolfe Research: "management noted encouraging stabilization in late September/October that provides greater long-term comfort."

### d. Risk Disclosures in 20-F Reports

133. Since monday.com is a foreign private issuer, it does not file quarterly reports with the SEC and is not required to update its risk disclosures between annual reports. The Company's only substantive risk disclosures appear once a year, in the Risk Factors section of its Annual Report on Form 20-F. During the entire Class Period, that meant the FY2024 20-F, filed March 17, 2025, contained the operative risk disclosures.

134. That report described the threat to the Company's search-driven customer acquisition as purely hypothetical—and as limited to "traditional" search. Under the heading "We rely on traditional web search engines to direct traffic to our website through search engines and networking sites," the FY2024 20-F warned only that "*[i]f* search engines modify their algorithms or design layouts, our website *may* appear less prominently or not at all in search results, which *could* result in reduced traffic to our website;" and "*[i]f* we are listed less prominently or fail to appear in search results for any reason, visits to our website *could* decline significantly, and we *may* not be able to replace this traffic." (Emphasis added).

135. These vague disclosures said nothing about AI-generated search results that were continuously disrupting monday.com's no-touch, paid search channels throughout the Class Period. As such, the only risk warning investors received at any point during the Class Period described a vague, hypothetical future risk all while Defendants knew the Company was experiencing an active, present disruption in its no-touch channels and in paid search due to the AI-related changes in search engines as described above.

136. These risk disclosures were materially false and misleading when made. A vague warning about what "may" or "could" happen "if" search engines change is misleading when the change has already happened and the harm is already underway. By August 11, 2025, Google's AI Overviews had rolled out worldwide, traffic to monday.com's website was in sustained decline, and Defendant Glazer conceded on that day that the Company was seeing "some softness within the down market due to the changes in the Google algorithm." Further, as FE-9 noted, these issues were already occurring during their tenure at the Company, which predated the Class Period.

137. In fact, Defendants' own later revision confirms that Defendants knew this disclosure was insufficient. In the FY2025 20-F, filed March 13, 2026—after the Class Period

ended and after Defendants admitted the deterioration was structural—Defendants rewrote the disclosure to warn of "our reliance on web search engines, both traditional *and AI generated*, to direct traffic to our website." It further updated its disclosure to read, "If search engines modify their algorithms, *AI-models*, or design layouts, our website may appear less prominently or not at all in search results, which could result in reduced traffic to our website, and we may not be able to replace this traffic. For example, *we have experienced declines in web traffic from google searches, primarily due to AI-generated search updates and algorithm updates, and we may experience similar issues in the future*." This also serves as a post-Class Period admission by Defendants that the no-touch channel deterioration was real and material to the Company. (Emphasis added).

**2. Defendants Announced and Repeatedly Reaffirmed a $1.8 Billion FY 2027 Revenue Target**

**a. September 17, 2025 Annual Investor Day**

138. During the September 17, 2025 Investor Day call, Defendant Glazer announced a $1.8 billion revenue target by FY 2027, based on then-current trends that the Company allegedly was seeing.

139. In response to an analyst's question regarding how investors should think about the attainability of the $1.8 billion FY 2027 revenue target, Defendant Glazer responded:

> *You should think about that as a base case. This is what we believe we can achieve*... This is not taking into account the fact that AI is going to generate significant ARR, in terms of the next few years because monetization will only start next year. *So you should think about it as base case and something that we would like to drive and achieve over time.*

(Emphasis added.)

140. Defendant Glazer also discussed the Company's remaining performance obligation, stating that this figure was "important" "[b]ecause it means that there is predictability

and visibility into the numbers of Monday" and because "[i]t provides us confidence in our ability to continue to grow the business." Defendant Glazer stated that "we see this number scaling to $768 million in Q2 of 2025."

141. When discussing the make up of the $1.8 billion figure, Defendant Glazer listed "the platform" that monday.com continued to invest in, "the fact that we are leveraging AI," and "the fact that we are enhancing the enterprise customers' capabilities, which means bigger and larger customers will continue to buy monday."

142. Although the target was forward looking, Defendants expressly grounded it in present conditions including purported multi-product success, touted AI adoption figures, and enterprise momentum. Defendant Glazer's description of the target as a "base case" compounded the impression that it rested on conservative assumptions, when the Company's own contemporaneous data reflecting weakness contradicted those assumptions.

143. Defendants' statements in ¶¶138-41 were false and misleading when made. The announcement of the $1.8 billion target and a $768 million remaining performance obligation in Q2 2025 gave the market the false impression that monday.com's revenue and growth channels were healthy, when the channels essential to that growth were deteriorating as described above—as Defendants well knew.

144. In reality, the three touted bases for the $1.8 billion revenue target were all faltering. First, monday.com's "platform" was failing. As discussed above, the deterioration of the no-touch channel was materially impacting the Company's growth trajectory. As potential customers began using artificial intelligence programs such as ChatGPT, Google's AI Overviews, or Microsoft Bing's Copilot AI, the Company's no-touch channel suffered from fewer sign-ups, a higher cost

to acquire new customers, and slower growth. FE-9 explained that a drop in click-through traffic meant that there was a decline in the efficiency and cost per marketing qualified lead.

145. Compounding this problem was the SMB segment's high churn, which, when combined with the issues in the no-touch channel, resulted in the Company "filling more and more water into that top of the bucket when you have a bigger hole leaking the water out on the bottom of the bucket." Similarly, according to FE-7, COO Adi Dar confirmed in December 2025 that revenue generated by the sales team was being offset by customer losses. As a result, the Company was "looking at our profit from a loss perspective and not from a net growth positive perspective."

146. Second, the $1.8 billion relied upon the Company's AI products, and Defendants surrounded the target with AI usage statistics and claims that AI "adoption is off the charts." But monday.com's AI products in no way supplied a reasonable basis for the $1.8 billion target. FE-2 described the AI products as "really confusing," noting that they didn't even understand what they were. Meanwhile, FE-8 stated that they "constantly got questions" from the referral partners FE-8 worked with about the Company's AI features, with comments such as "This thing doesn't work. What is the goal of this? It doesn't make sense." FE-8's referral partners had particular problems with the Company's "Vibe" AI tool. "Vibe didn't work," FE-8 said. Then, FE-9 explained that AI is "not a big money maker for them," as a lot of the AI features for Monday were either metered or behind a paywall. And Defendant Glazer himself acknowledged that AI "monetization will only start next year." Defendants' AI narrative could not fill the gap left by the deteriorating no-touch channel; it served instead to distract investors from that deterioration.

147. The third basis for the $1.8 billion—the Company's emphasis on enterprise customers—also did not provide meaningful support for the target. In fact, FE-1 commented on the steep competition among enterprise customers, while FE-5 noted that enterprise contracts were

stalling and customers were dissatisfied with services. Then, FE-6 also spoke to the "big concern with . . . Enterprise readiness" and "retention," with the internal sentiment being that "we don't have a good enough product to sell to a lot of these customers." FE-6 explained that it was "mostly just the product couldn't serve bigger organizations. It was good for SMB and Mid-Market, but once it got to bigger orgs and dealt with different hierarchies and complexities, it was hard to sell," and that the difficulty selling to Enterprise customers "was something the Sales team would always talk about in meetings as to why they missed their plan." In addition, FE-9 stated that the Company faced a "product market fit gap" and that "monday's not any node on that enterprise architecture," identifying that the Company's aspirations to grow into a full-fledged enterprise solution were farfetched, as the Company remained heavily reliant on the SMB market driven by the no-touch channel to spur its growth. FE-9 explained it was their belief that CEO Eran Zinman's vision was to have monday.com's platform be a single source where all work resides for an enterprise organization. FE-9 thought this vision to have the Company be a "single source of truth" was "aspirational" rather than a "reality."

148. In addition to the fact that none of the three stated bases for the $1.8 billion revenue target were realistic, the Company's internally discussed goal of $10 billion ARR within five years—which would have directly translated into the $1.8 billion by 2027 target—was "pulled out of thin air." According to FE-3, executive management never explained why they felt the Company could hit that target, and they did not make any major product shift along with this target. FE-3 said that sales employees felt that target "did not seem reachable." FE-1 likewise said that this goal did not seem reasonable to employees and that "the idea wasn't sold very well to us internally." Similarly, every employee FE-5 spoke with questioned the $10 billion revenue target and considered it unattainable. This is not surprising, considering FE-2's account that "no one" in

FE-2's department of 30 people hit their revenue goals because "[w]e didn't have a ton of product to sell." FE-3 shared that from summer 2024 through all of 2025 there were very high monthly and quarterly goals, and that there was "very little attainment" of those goals. Asked if monday.com was always behind plan throughout FE-6's tenure, FE-6 said, "[y]eah, for the most part." Additionally, according to FE-8, there was "definitely doubt" internally about the $1.8 billion revenue target, with people thinking it was "an arbitrary number."

149. Further throwing the validity of the $1.8 billion target into doubt, FE-6 also explained how in the second half of 2025, it was well known at the Company that it was internally recognizing "tens of millions" of dollars in payments or customer spending that it was not in fact receiving. FE-6 explained that, "certain things would be counted or not counted in the renewals. It was a very makeshift number because we allowed the ability for sales reps to turn on and off the subscriptions whenever they wanted to – obviously, they would have a reason – but it made the renewal data pretty messy because you would see a one-year contract, but it would be turned off in the middle of the year. And we just didn't have good reporting for that." Due to the inherent unreliability of the Company's data, it was reckless for Defendants to tout that a $1.8 billion revenue target or a $768 million remaining performance obligation was attainable.

150. Analysts adopted Defendants' view of the target as a credible baseline:

- DA Davidson: "The big number from the analyst day was the FY27 revenue guide for $1.8B implying 20% Y/Y growth over FY26 consensus estimates," and "The FY27 revenue guide represents a base case for MNDY."
- J.P. Morgan: "Monday provides a 'base case' interim outlook that calls for revenue of $1.8B in FY27 (in-line with consensus), which implies a ~21% revenue CAGR."
- Wolfe Research: "The money slide was the updated FY27 revenue target of $1.8B."
- William Blair: "we believe this is an achievable initial estimate, with management indicating it is a baseline case."

### b. November 10, 2025 Earnings Call

151. On November 10, 2025, during the third quarter fiscal 2025 earnings call, Defendant Mann reaffirmed the $1.8 billion target that had been introduced at the September Investor Day, stating:

> *In Q3, we delivered another quarter of strong results and disciplined execution, putting us firmly on track towards our Investor Day revenue target of $1.8 billion of FY '27.* We saw robust net additions of over $100,000 plus and $500,000-plus paying customers, reflecting the strength of our go-to-market engine and the expanding demand of our platform. We also reported our largest ever non-GAAP operating profit, reinforcing our ability to scale efficiently while continuing to invest in innovation.

(Emphasis added.)

152. Defendants' statements in ¶151 were false and misleading for the reasons stated above in ¶¶138-41 and for the following additional reasons. Defendant Mann's representation that third quarter results put monday.com "firmly on track towards our Investor Day revenue target of $1.8 billion of FY '27," grounded the target in present fact, and gave the false impression that the Company was seeing no material weakness in its growth.

153. The trends the Company was actually seeing were that the no-touch channel deterioration had persisted, and in sales, as described by FE-2, "no one hit [their goals]" and "[m]id-market definitely didn't hit their segment targets" at the end of 2025. Defendants' confidence in the $1.8 billion target was not merely optimistic, but unfounded and contradicted by contemporaneous internal conditions, such as declining customers and customer usage, the slow monetization of AI products, and limited enterprise expansion. It was based on a $10 billion ARR target that was "pulled out of thin air," and was touted despite the "data issues" created by the Company internally recognizing "tens of millions" of dollars in payments or customer spending that it was not in fact receiving.

154. Analysts remained bullish on the strength of Defendants' reaffirmations, and the stock price remained artificially inflated:

- DA Davidson: "management remains confident in the FY27 revenue guide for $1.8B and was notably positive about its move upmarket, better than expected AI adoption, and multi-product opportunity."
- TD Cowen: "reiterated its FY27 rev target of $1.8b that calls for ~21%+ 2-yr CAGR, making valuations highly attractive."
- Wolfe Research: "management reiterated their commitment to the $1.8B FY27 revenue target and expressed confidence in FY26/FY27 linearity in consensus estimates."
- William Blair: "Monday signaled that it was confident in consensus estimates for 2026 and reiterated its 2027 revenue target of $1.8 billion in revenue."

### G. The Truth Begins to Emerge on November 10, 2025

155. Upon release of the November 10, 2025 third quarter 2025 results, the truth regarding the deterioration of monday.com's business began to emerge. Although the third quarter results exceeded consensus estimates, Defendants guided fourth quarter revenue to a range of $328 million to $330 million—below expectations and implying deceleration in the Company's projected growth rate.

156. The market reacted as shares of monday.com on November 10, 2025 closed down approximately 12.3%.

157. However, as described above, the November 10, 2025 disclosures were only partial, as Defendants accompanied the disappointing guidance during the accompanying earnings call with misleading assurances that the top of funnel and paid search had seen "encouraging stabilization," that the pipeline was "growing according to our plans," that the guidance reflected mere "timing effects," and that the Company remained "firmly on track" toward the $1.8 billion FY 2027 revenue target. These misrepresentations continued to conceal the structural and

persistent nature of the no-touch channel deterioration and rising customer acquisition costs and maintained the Company's artificially inflated stock prices.

### H. The Truth Emerges at the February 9, 2026 Fourth Quarter 2025 Earnings Call

158. On February 9, 2026, Defendants published their fourth quarter and full fiscal year financial results. The release confirmed the deterioration Defendants had spent the Class Period denying. In pertinent part, Defendants revealed:

a. Revenue growth continued to decelerate. Fourth quarter revenue of $333.9 million represented year-over-year growth of 25%, down from 26% in the third quarter of 2025, 27% in the second quarter, 30% in the first quarter, and 32% in the fourth quarter of 2024.

b. Net dollar retention rate fell to 110% from 112% as of December 31, 2024.

c. The number of net adds for paid customers with more than 10 users declined from 5,526 in 2024 to 4,700 in 2025.

d. Comparing Q4 2024 to Q4 2025, year-over-year non-GAAP operating margin fell to 13% from 15%. GAAP operating income fell to $2.4 million from $9.6 million. Adjusted free cash flow fell to $56.7 million from $72.7 million, and adjusted free cash flow margin fell to 17% from 27%.

159. The guidance issued the same day disclosed the scale of what Defendants had concealed. The Company projected first quarter 2026 revenue of $338 million to $340 million, growth of approximately 20%, and full year 2026 revenue of $1,452 million to $1,462 million, growth of 18% to 19%. It projected non-GAAP operating margin of 11% to 12%, down from 14% in 2025, and adjusted free cash flow margin of 19% to 20%, down from 26%. These figures represented a marked decline from prior projections.

160. Despite significantly lowered FY 2026 guidance, Defendants Mann and Zinman continued to misleadingly suggest that the Company was performing well, and were quoted in the press release as saying:

> We delivered another year of strong, disciplined execution in 2025, with 27% revenue growth and a 14% non-GAAP operating margin, while expanding our product portfolio and seeing strong adoption of our AI products. At the same time, we continue to make progress upmarket, as larger customers increasingly adopt more solutions and standardize on monday.com for mission-critical workflows.

161. During the accompanying earnings call, Defendant Glazer highlighted monday.com's long-term growth trajectory as presented at the September Investor Day but rescinded the Company's $1.8 billion 2027 revenue target entirely, stating, in pertinent part:

> *We ended the quarter with $1.5 billion in cash and cash equivalents compared to $1.53 billion at the end of Q3, reflecting [$135 million] of share repurchase executed during the quarter. As of the end of Q4, approximately $735 million remained available under our existing share purchase authorization program.* Adjusted free cash flow for Q4 was $56.7 million and adjusted free cash flow margin was 17%. In fiscal year 2025, adjusted free cash flow was $322.7 million and adjusted free cash flow margin was 26%. Adjusted free cash flow is defined as net cash from operating activities, less cash used for property and equipment and capitalized software costs, plus costs associated with the build-out and expansion of our corporate headquarters.
>
> *Before I discuss guidance for fiscal year 2026, I did want to touch on our approach to guidance moving forward. Our confidence in the underlying fundamentals of the business and our long-term financial trajectory remains unchanged since our Investor Day in September. Given the evolving nature of the AI landscape and the choppiness in the no-touch demand environment, we believe it is responsible to keep our near-term communication focused on what we can execute and deliver with high confidence.*
>
> *As a result, we will no longer be discussing our previously provided 2027 targets, but we'll be centering our discussion on our 2026 outlook, which reflects the continued momentum we see across our AI work platform, new product introductions, and upmarket sales motion.* We remain committed to disciplined execution, which is consistent with our track record, and we will revisit long-term targets when there is a greater visibility and it's appropriate to do so. Let's now turn to our outlook for fiscal year 2026.

(Emphasis added.)

162. During the question-and-answer segment, Defendants discussed the 2026 guidance noting that the slower enterprise growth, longer sales cycles, and shifts in marketing spend contributed to the softer near-term outlook:

<Q: *Guidance for now reflects what we believe we can execute against with high confidence. It doesn't assume any rebound in performance marketing or top-of-the-funnel activity.* (Glazer)

*As you rightfully stated, NDR to remain flat at 110%, sorry, by the end of the year. With regards to maybe the margins, we assume that we are going to go in terms of headcount growth of mid-teens.* (Glazer)

*…as we said at the last time we gave guidance, we felt and we believed based on the visibility that we had at the time that the 1.5 number is a number that we are going to achieve. It looks reasonable to us. Since then, there is a lot of noise in the market in terms of macro economy. As we said, our no-touch business continued to be choppy and volatile.*

*We didn't see the improvement that we expected to see. And we see shift in the business and shifting the business takes time. So this is why we thought based on what we know today, that it would be prudent to reset the guidance that we are giving. And we -- given the current macro, as I mentioned, and the demand environment, we believe that it's appropriate to put numbers that reflect what we can execute against, sorry, with high confidence. And this is the reason why we did this adjustment.*

*We are expecting it not to get any better from what we have seen in fiscal year 2025. We didn't see the improvement that we hoped for, or we believe that we're going to see. So we believe it might be choppy. It will – not might be. It will be choppy throughout 2026.*

<A: Eliran Glazer> To your first question, and then I will defer to Roy and Eran. *As I said, due to the macro economy and the choppiness that we have seen, this is the 2027 number is currently off the table, and we are focusing on fiscal year 2026 execution.*

< Zinman> on the second part of the question about AI. *I think most -- look, I feel the whole industry is living and breathing AI and aware of all the changes and improvement. But -- most of our customers, and I don't think we're in a unique position, are still trying to figure out what's the best way to leverage that technology.* And for them, the best way to leverage that technology is use all these systems they're using before where they have most of the data in the context and the workflows. And with that, they're trying and a vendor that they trust and love to use. And on that, they're trying to leverage their capabilities.

(Emphasis added.)

163. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the 2025 conferences, earnings calls, and shareholders calls. On those calls, Defendants continually downplayed persistent

weakness in their no-touch channel while touting the Company's continued expansion of its core platform, AI-driven investments, increasing enterprise adoption and multi-product integration, and repeatedly affirmed monday.com was "on track" on achieving its full year 2027 revenue target of $1.8 billion, while minimizing signs of slowing customer growth, persistent no-touch channel disruption, the slow monetization of the Company's substantial investment into AI products, the struggles with enterprise expansion, and the Company's reliance on targets "pulled out of thin air" and based on faulty data.

164. Investors and analysts reacted immediately to monday.com's revelation. The price of monday.com's ordinary shares declined dramatically. From a closing market price of $98.00 per share on February 6, 2026, monday.com's stock price fell to $77.63 per share on February 9, 2026, a decline of about 21%.

165. A number of well-known analysts who had been following monday.com lowered their price targets in response to monday.com's disclosures:

- Capital One dropped their price target by 47% noting that, "[i]mportantly, the $1.8B 2027 revenue guidance that was given in September at their Analyst Day is now off the table (we are at <$1.7B)… The company said that there is no weakness to call out in the core work management product due to optimizations, just general softness down market. cRPO growth decelerated <1% to 31% y/y in 4Q."

- Wolfe Research published a report titled "Monday (not)FunDay" lowering the firm's price target to $95 from $98, highlighting Monday's withdrawn full-year 2027 guidance, commenting, "MNDY posted another mixed quarter with strong upmarket momentum and early AI traction but persistent no-touch headwinds, FY26 guide below cons and withdrawn FY27 targets pressuring results. Valuation now at 1.5x CY27 revenue."

- Baird Equity Research downgraded to neutral commenting, "[w]hile many expected the revenue guide to come in below Street, the reset in margins and removing the 2027 targets were negative surprises."

166. Indeed, the February 9, 2026 disclosures prompted analysts to severely reduce their price targets for the Company: Analysts at Needham dropped their price target from $250 to $125,

while TD Cowen cut their price target from $200 to $125, and analysts at both Wells Fargo and Oppenheimer cut their price target from $200 to $130.

167. The fact that these analysts, and others, discussed monday.com's shortfall and below-expectation projections suggests the public placed significant weight on monday.com's prior growth estimates, projected revenue targets, and no-touch channel impact. The frequent, in-depth discussion of these issues confirms that Defendants' misstatements during the Class Period were material.

## V. ADDITIONAL SCIENTER ALLEGATIONS

168. As alleged herein, Defendants acted with scienter as they knew the public statements they made on behalf of monday.com were materially false and misleading when made or were deliberately reckless in disregarding or omitting the true facts, which were available to them.

### A. Defendants' Own Words Establish Their Contemporaneous Knowledge of Deterioration in the No-Touch Channel, AI Product Offerings, and Enterprise Business Expansion

169. By Defendants' own account, they observed and consistently monitored deterioration in monday.com's no-touch channel throughout, and even prior to, the Class Period. From the outset, at the August 11, 2025 earnings call, Defendant Mann conceded that the downward trend in this channel was already familiar to management, noting "it's not something we didn't see before." Such statements were admissions that Defendants had been monitoring a known, developing phenomenon.

170. Similarly, during the September 17, 2025 Investor Day Conference, Defendant Mann explained how now, with AIO, "when customers search for solutions within like, a ChatGPT, or other such apps, AI apps, and they come to us. So, we see the traffic. So, they get a result with monday.com, they click it, they come to us."

171. Defendant Mann further stated,

> So, *we see the traffic that we get from AIO growing bigger and bigger*, it's exponential. It's still fairly small, okay, but it's growing steadily, and *we put a lot of emphasis into making this work with BigBrain. We are working hard to build the systems that will help us monitor, optimize, and like also succeed in this area*, adding to our entire marketing machine.

(Emphasis added). Defendants knew that such a shift to AIO in its marketing strategy was only necessary due to the deterioration in its no-touch channel as a result of AI-generated answers in search engines.

172. Defendants' statements at the February 9, 2026 fourth quarter 2025 earnings call similarly demonstrated that they had been monitoring trends in the no-touch, self-serve acquisition channels: Defendant Mann admitted that "the cost to acquire and expand self-serve customers have increased over the past year, and the returns on those investments have been below historical levels;" while Defendant Glazer conceded that "[w]e didn't see the improvement that we expected to see" in the no-touch channel.

173. Defendants' statements also demonstrate their intimate familiarity with monday.com's AI product offerings and the extent of their adoption. For example, Defendant Zinman told investors at the Investor Day that "we want to go all in on AI," and that monday.com was "amplifying and changing our company North Star" from managing work to "actually doing the work for our customers" using AI. He reported "over 67 million AI actions on our platform," "45,000 actions in monday sidekick alone," "7,000 apps" built in monday vibe "in just two months," and "2,000 solutions" built with monday magic in "less than three months," concluding that "[w]e've never seen traction like this in any feature we've released" and that "[o]ur customers are thirsty for AI usage, and the adoption is off the charts." Defendant Glazer identified continued investment in "platform and AI" as a "growth driver," and Defendant George told investors that

"AI is foundational to all of this," explaining that "when I say multi-product, we lead with AI. When I say accelerate upmarket, we lead with AI. When I say customer retention . . . AI is at the forefront of that."

174. These statements demonstrate Defendants' engagement and in-depth knowledge regarding customers' use and adoption of the Company's AI products. Thus, the only reasonable inference is that Defendants knew, or recklessly disregarded, the slow monetization of their AI investment.

175. Similarly, Defendants' statements indicated their focus on, and engagement with, monday.com's enterprise performance and expansion. For example, in the August 11,2025 earnings call, Defendant Zinman stated that "we had a record add of enterprise customers, customers over $100,000" and "we're definitely also focused on landing larger enterprises." The slides from that call also included a slide showing alleged growth in the number of enterprise customers since Q2 2024. During the September 17, 2025 Investor Day Call, Defendant Mann discussed how a "larger and larger percent of [customers are] choosing our enterprise tier." The slides for Defendant George's portion of the presentation include two slides concerning the Company's "moving upmarket" strategy, which state that "all existing enterprise accounts are underpenetrated," and that the Company's strategy will be to "leverage touch channels to target and build relationships with C-suite executives." And then, at the February 2026 Earnings Call, Defendant Mann specifically discussed the "record net adds" and growth of enterprise customers, and Defendant Zinman added, "we actually see high levels of cross-retention" in enterprise customers and "we also see renewal rates in the high 90s."

176. These statements demonstrate Individual Defendants' high visibility into the Company's enterprise segment, thereby indicating that they knew, or recklessly disregarded, the

signs that the enterprise expansion would not in fact be sufficient to support their stated $1.8 billion revenue goals.

### B. Individual Defendants Touted the Company's BigBrain Analytics System and Admitted to Monitoring Internal Data

177. Throughout the Class Period, Defendants touted BigBrain, the Company's proprietary internal analytics platform, through which—in Defendant Zinman's own words—"*we monitor every campaign, every click, every expense.*" Not only do such statements constitute direct admissions that Defendants themselves monitored internal performance marketing data, but they also misled the market into believing that Defendants' statements were credible and based on sound internal data.

178. During the August 11, 2025 earnings call, Defendant Mann touted clear visibility into their internal performance marketing metrics, stating:

> *Like, we have a big brain, and we monitor all the performance stuff. So we see areas that we are more efficient in, so we move resources there.*

And later on the call, Defendant Zinman stated:

> I think what gave us a lot of confidence throughout all the years we've been doing performance marketing is one, we don't only do just AdWords [paid search]. So we have a lot of other channels as well. And also, *we monitor every campaign, every click, every expense. So we're not flying blind. Everywhere we feel unoptimized, we optimize. So we know we can optimize. We know we have full visibility into how we spend that budget.*

(Emphasis added.)

179. During the September 17, 2025 Investor Day Conference, Defendant Mann further demonstrated his in-depth familiarity and engagement with the Company's internal performance marketing metrics when he presented a bar graph outlining the Company's Performance Marketing spend since Q1 2021. Defendant Mann explained,

> [W]e tweak our spend in two areas that we know will work efficiently *we do that as we said before with big brain*. It's all automatically, and we know how to move budgets. So, it will be done efficiently.

(Emphasis added).

180. On that same call, Defendants also touted contemporaneous metrics, including remaining performance obligations ("RPOs"),[11] that they stated provided "predictability and visibility into the numbers of monday" in support of their $1.8 billion target.

181. Defendant Glazer further described on the November 10, 2025 earnings call how the Company's spending decisions were made in real time on the basis of BigBrain's data, proclaiming "due to our BigBrain capabilities, when we see high returns, we are investing in performance marketing, and we see immediate dollars." And as discussed below, multiple FEs confirm Defendants' access to BigBrain.

182. Indeed, in responding to direct questions regarding paid search and the no-touch channel, Defendants directly referenced internal data, confirming that they were monitoring the channel closely. For instance, at the September 2025 Investor Day, Defendant Beber reassured the market about paid search weakness by stating that the "category has seen about a 16% decline in clicks, where we've only seen a 9% decline in clicks," again affirming that granular data in this channel was being collected, tracked, and seen by Defendants. Likewise, Defendant Zinman's representation on the November 2025 earnings call that the Company saw "encouraging stabilization in new sign-up and top of funnel," where the no-touch acquisition channel operated, again strongly evinces that the Individual Defendants themselves were monitoring internal data in these channels. In addition, during the August 11, 2025 earnings call, Defendant Zinman told

---

[11] RPOs are defined by the Company in their August 10, 2026 Press Release as "the aggregate amount of transaction price allocated to performance obligations that are unsatisfied or partially unsatisfied at the reporting date, including both deferred revenues and non-invoiced amounts expected to be billed and recognized in the future."

investors that the Company monitors "every campaign, every click, every expense" and that "[w]e adjust budget on a daily basis," and Defendant Mann said the Company "monitor[s] all the performance stuff" and moves resources accordingly. During the November 10, 2025 earnings call, Defendant Glazer said the Company was "investing in performance marketing where we see the return on investment," and during the February 9, 2026 earnings call, Defendant Mann reported that the cost to acquire and expand self-serve customers had increased over the past year and that the returns on those investments had been below historical levels. Defendants could not have made these statements without having and being aware of specific and channel-level data. Moreover, because the Company paid Google for each click on its search advertisements, it necessarily received click and cost data for every paid-search campaign, and, as FE-6 confirmed, click-through data flowed into BigBrain (¶79). Each of Defendants Mann, Zinman, Glazer and Beber thus had, were aware of, and reviewed data on the condition of the no-touch channel and related traffic and expenses as well as other related matters, when making the statements alleged herein.

## C. Former Employees Add to the Scienter Analysis

183. As set forth in ¶¶54-109, former monday.com employees describe Defendants' involvement in aspects of the Company that add directly to the inference of scienter.

184. As to BigBrain, FE-1 shared that renewals were tracked internally within monday.com and shared with the customer success leadership, and "likely" the sales leadership. FE-3 described the granular internal reporting available through BigBrain, stating that BigBrain tracked "everything," and that regular account status reports available on BigBrain were updated daily and could be accessed by any employee. FE-4 confirmed these statements, adding that senior leadership "definitely" had access to it, because as the Company's "main data source," "[e]verything went into BigBrain." FE-6 even stated there were "screens plastered across the

office" showing data from BigBrain dashboards because it was part of the Company's "culture." "BigBrain would have been the source of truth for all that."

185. As to the no-touch channel, FE-9 spoke about how rising CAC due to disruption in the Google search channel was "a known fact . . . throughout the Company" and that this issue was discussed "in every single marketing meeting." FE-9 even spoke with Head of Marketing Emmanuel Cohen about it. FE-9 noted that this was not "a secret or unknown reality" for monday.com's product marketing team during their tenure.

186. Then, as to the $1.8 billion figure, FE-2 stated that their team raised expansion problems and difficulties hitting targets with management directly. According to FE-2, "[w]e'd share all the time it was difficult and things weren't going well," and their manager would tell them he heard them and say he would bring it back to leadership, but nothing came of it. FE-2 stated that "leadership knew" about the growth issues, and that "[t]hey knew that the business wasn't doing well." FE-2 said that leadership shifted the blame to the account managers, calling them lazy and saying that they were not working hard enough.

187. Meanwhile, FE-6 recounted how the miscounting of "tens of millions of dollars" in customer spending was discussed frequently in strategy meetings and that "all my senior leadership knew about it on the Strategy and Operations side." FE-6 said that the CRO at the time, Jamison Powell, knew about this issue because he attended meetings with FE-6 where the issue was discussed. As to the Company's failure to hit its plan, FE-6 added that "[e]veryone was aware of it. It was pretty well-known. So Jamison, all the sales managers, all the data teams, my team were involved in trying to fix that." And FE-7 recalled attending a December 2025 on-site meeting, hosted by COO Adi Dar, who told between 70 to 100 customer managers that revenue being generated by the sales team was being offset by customer losses. With respect to COO Dar, FE-9

also stated, "Adi Dar is a bean counter," and "I don't think there's a nickel anywhere in that Company that Adi didn't know where it came from."

### D. The Company's No-Touch Channel, AI Product Investment, and Enterprise Expansion Were Core to the Company's Operations

188. Defendants' no-touch, self-serve acquisition funnel was foundational to the Company's go-to-market strategy and a core driver of the Company's rise to prominence. From the beginning, the Company focused an outsized portion of its acquisition engine around paid search, online marketing, and a self-serve funnel where customers were primarily acquired with little to no human interaction.

189. The centrality of the paid search channel in particular was emphasized repeatedly during investor conferences and earnings calls throughout the Class Period. Indeed, the Company's own annual reports confirmed that monday.com's success depends on its "ability to attract customers through paid and unpaid internet search results on web search engines, such as Google," and that the "prominence of our website in response to internet searches" is "a critical factor in attracting potential customers to our products."

190. FE-9 confirmed that "a lot of the marketing budget with monday in general was going to search term words" and "monday's paying big dollars to Google to move to the top of the search results and usurp that spot from Asana." The Company would not pour this kind of marketing spend into a channel that was not central to its business.

191. Analysts consistently asked pointed questions and reported on paid search weaknesses as they arose. Each time, Defendants provided misleading reassurances that were detailed and specific—characterizing any downward trend as fleeting and immaterial, and masking the weakness by invoking pipeline health, enterprise growth, and distracting investors with a slew of new AI product announcements. Therefore, the no-touch channel was not a peripheral

acquisition channel; it was the mechanism by which monday.com acquired a significant portion of its new customers.

192. AI products were likewise a core operation of the business. Throughout the Class Period, as discussed above, Defendants repeatedly touted and described in detail their new AI product offerings, including monday magic, monday vibe, monday sidekick, and monday agents in investor conferences and earnings calls. Further, the Company's 2025 annual report states that the Company has "incorporated AI capabilities platform-wide, including both product-specific features and standalone offerings," reflecting a transition "from helping people to manage their work to helping do the work for them." This is consistent with FE-9's account that the Company had "hitched a lot" of its growth plan to the adoption of AI, and FE-2's accounts of a push to sell AI starting in the spring of 2025.

193. Similarly, the Company's desired enterprise expansion was also a core operation of the business during the Class Period. As discussed above, Defendants repeatedly emphasized the Company's focus on expanding its enterprise business at investor conferences and earnings calls. As stated in the Company's 2025 annual report, "we are increasingly allocating resources toward enterprise sales efforts." In fact, according to the Company's April 3, 2025 press release, Defendant George was hired to "lead the company's next phase of growth, *specifically within the enterprise market*." This is corroborated by FE-5, FE-6, and FE-9's statements regarding the big push to make headway in the enterprise market. Thus, during the Class Period, the Company's AI product offerings and planned enterprise expansion were a core part of the business, and it is not plausible that Defendants were not aware of issues in those areas when making statements to investors.

## VI. LOSS CAUSATION AND ECONOMIC LOSS

194. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class (defined herein). During the Class Period, Plaintiff and Class members purchased monday.com's ordinary shares at prices that were artificially inflated by Defendants' misconduct, as alleged herein.

195. During the Class Period, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of monday.com's ordinary shares and operated as a fraud or deceit on Class Period purchasers of monday.com's ordinary shares by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market and the price of monday.com's ordinary shares materially declined as the prior artificial inflation came out of the price over time. As a result of their purchases of monday.com's ordinary shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws.

196. monday.com's stock price fell in response to the corrective events, as alleged *supra*. On these dates, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning monday.com's forecasting processes and growth guidance.

197. In particular, on November 10, 2025 and on February 9, 2026, monday.com issued disclosures that contradicted previous statements about its then-current business operations and financial health. These disclosures caused monday.com's stock price to decline as the artificial inflation caused by prior misleading statements began to dissipate. In response to each disclosure, monday.com's stock price declined materially and caused damages to investors.

198. As the allegations herein demonstrate, however, the November 10, 2025 disclosure was only a partial materialization of the concealed risks: Despite revealing lower-than-expected guidance, Defendants simultaneously reassured the market that the no-touch channel had seen "encouraging stabilization," that the pipeline was "growing according to our plans," that the guidance reflected mere "timing effects," and that the Company remained "firmly on track" toward the $1.8 billion FY2027 target. As such, the stock price remained artificially inflated after November 10, 2025.

199. The February 9, 2026 disclosures revealed the whole truth, including the withdrawal of the FY 2027 target, significantly lowered guidance for FY 2026, lowered free cash flow guidance, rising customer acquisition costs, and the persistent and continuing deterioration of the no-touch channel deterioration throughout the year and into 2026.

200. As a direct result of Defendants' disclosures, monday.com's stock price plummeted approximately 21% on February 9, 2026 to a close of $77.63, costing investors over a billion dollars in shareholder value.

## VII. APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

201. The market for monday.com's ordinary shares was open, well developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, the Company's ordinary shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's ordinary shares, relying on the integrity of the market price of such securities and on publicly available market information relating to monday.com. Plaintiff and Class members have been damaged thereby.

202. During the Class Period, the artificial inflation of the value of monday.com ordinary shares was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's ordinary shares to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's ordinary shares, causing Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

203. At all relevant times, the market for monday's ordinary shares was an efficient market for the following reasons, among others:

(a) monday.com's ordinary shares met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) monday.com communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) monday.com was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the

Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about monday.com was reflected in and incorporated into the Company's stock price during the Class Period.

204. As a result of the foregoing, the market for monday.com's ordinary shares promptly digested current information regarding the Company from all publicly available sources and reflected such information in monday.com's stock price. Under these circumstances, all purchasers of monday.com's ordinary shares during the Class Period suffered similar injury through their purchase of monday.com's ordinary shares at artificially inflated prices, and a presumption of reliance applies.

205. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the *United States Supreme Court in Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## VIII. NO SAFE HARBOR

206. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, many of the statements challenged herein are statements of then-existing fact, or contain severable assertions of then-existing fact, and fall outside the safe harbor entirely. As to any statement properly characterized as forward-looking, the safe harbor is unavailable because the accompanying cautionary language was not meaningful: it remained generic and static, warning only that the identified risks "may" or "could" materialize, at a time

when the risk had already materialized and Defendants knew that it had. Defendants further made or approved each such statement with actual knowledge that it was false or misleading. Defendants provided investors with revenue projections while at the same time explicitly connecting such projections with present-tense conditions.

207. Defendants provided the public with forecasts that failed to account for decline in growth and acquisition channels and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

208. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, the cautionary statements accompanying them were not meaningful. The warnings Defendants identified were generic, were not tailored to the specific projections challenged here, and remained unchanged even as the risk they described ceased to be hypothetical and began to materialize.

209. To the extent that the $1.8 billion FY2027 revenue target or other such statements may be characterized as forward-looking, Defendants expressly grounded these representations in the Company's presently observed, contemporaneous conditions regarding the health of their business.

210. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of monday.com who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or

relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## IX. CLASS ACTION ALLEGATIONS

211. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired monday.com's ordinary shares during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

212. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, monday.com's ordinary shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by monday.com or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 31, 2024, there were 50.77 million shares of the Company's ordinary shares outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

213. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

214. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

215. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of monday.com;

(c) whether the Individual Defendants caused monday.com to issue false and misleading statements of material fact during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of monday.com's ordinary shares during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

216. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

***Against All Defendants for Violations of***
***Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder***

217. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

218. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

219. During the Class Period, Defendants engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of monday.com ordinary shares; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire monday.com's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

220. Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for monday.com's securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

221. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

222. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of monday.com's internal affairs.

223. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the

Company. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to monday.com's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of monday.com's ordinary shares were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired monday.com's ordinary shares at artificially inflated prices and relied upon the price of the ordinary shares, the integrity of the market for the ordinary shares, and/or upon statements disseminated by Defendants, and were damaged thereby.

224. During the Class Period, monday.com's ordinary shares were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of monday.com's ordinary shares at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ordinary shares or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of monday.com's ordinary shares was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of monday.com's ordinary shares declined sharply upon public disclosure of the facts alleged herein, to the injury of Plaintiff and Class members.

225. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

226. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's ordinary shares during the Class Period, upon the disclosure of the true facts that Defendants' materially false and misleading statements and omissions had concealed.

## COUNT II

***Against the Individual Defendants***
***for Violations of Section 20(a) of the Exchange Act***

227. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

228. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about monday.com's misstatements.

229. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by monday.com which had become materially false or misleading.

230. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which monday.com disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants

exercised their power and authority to cause monday.com to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of monday.com's ordinary shares.

231. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same, to cause monday.com to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

232. By reason of the above conduct, the Individual Defendants and/or monday.com are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: October 13, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ Amanda F. Lawrence*
Amanda F. Lawrence (AL8804)
156 South Main Street
P.O. Box 156
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
alawrence@scott-scott.com

Nicolas Apter-Vidler (NY 5944186)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
napter-vidler@scott-scott.com

*Counsel for Lead Plaintiff Steve Quinn and the Proposed Class*

Brian Schall
**SCHALL, BROWN & SCHWARTZ LLP**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 213-519-5876
brian@schallfirm.com

*Co-Counsel for Lead Plaintiff Steve Quinn and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2026, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on October 13, 2026, at Colchester, Connecticut.

*/s/ Amanda F. Lawrence*
Amanda F. Lawrence